[No. 1168.]

## THE STATE OF NEVADA EX REL. DAVID S. TRU-MAN, DISTRICT ATTORNEY OF NYE COUNTY NEVADA, RELATOR, v. D. C. McKENNEY, JUDGE OF THE FIFTH JUDICIAL DISTRICT COURT, NYE COUNTY, RESPONDENT.

INDIANS LIVING IN TRIBAL RELATIONS—CRIMES BY—JURISDICTION OF COURTS.—
The courts of this state have no jurisdiction to try an indian belonging to a tribe which is recognized and treated with as such by the government of the U. S., having its chief and tribal laws, for killing another indian belonging to the same tribe.

IDEM.—As both indians were under the authority and subjection of such tribal laws the authorities of the tribe alone have the right to take cognizance of the crime. It was not the intention of the legislature that the territorial or state laws defining crimes and providing for their punishment should apply to crimes committed by indians, against each other, living in their tribal relations. The courts of this state could only obtain jurisdiction of such offenses by an affirmative act of the legislature, or a self-acting clause of the constitution.

IDEM—POLICY OF THE FEDERAL AND STATE GOVERNMENTS.—The policy of the federal and state government toward the indian tribes within their borders, and the status of the indians, living in tribal relations, stated and dis-cussed at length.

APPLICATION for *mandamus.*

The facts are stated in the opinion.

*David S. Truman,* District Attorney of Nye County, for Relator :

I. Statutes of U. S. referring to the criminal jurisdiction over indians.   (Rev. Stat. secs. 2145, 2146, 5339.)

II. The definition of murder by the statutes of this state is broad enough to include all human beings of any nation-ality, regardless of race, color or extraction, and the indian, having been indicted of murder, is amenable to the state laws the same as any other person within our territorial jurisdiction.   (1 Comp. L. 2321 ; 1 Bish. Cr. L. secs. 124, 134, 154, 172, 178, 988 ; 2 Bish. Cr. L. sec. 630 ; *U. S.* v. *Rogers,* 4 How. 572 ; *U. S.* v. *Yellow Sun,* 1 Dil. 271 ; *Ex parte Reynolds,* 5 Dil. 394 ; 6 Pet. 575 ; *Hunt* v. *State,* 4 Kan. 60 ; *Adams* v. *People,* 1 Comst. 173 ; *People* v. *Mc-*

*Leod,* 1 Hill, 377 ; *State* v. *Doxtater,* 47 Wis. 278 ; *U. S.* v. *Leathers,* 6 Saw. 17 ; 7 Cranch, 32 ; 1 Whar. Cr. L. secs. 163, 166, 541.)

*W. H. Davenport,* Attorney General, also for Relator :

I. A state has the power, by virtue of her sovereignty, to assume jurisdiction by enactment, of the crime of murder and other offenses committed by indians within her territorial limits, whether upon or off an indian reservation ; *provided, always,* that there are no statute or treaty provisions granting or retaining jurisdiction in favor of the United States. (*State* v. *Forman,* 8 Yerger, 256, 335 ; *Caldwell* v. *State,* 1 Stew. & Por. (Ala.) 327 ; *State* v. *Tassels,* Dudley (Ga.) 229.)

II. In the case of indians maintaining their tribal organization, which is recognized in the treaty by the general government, but living upon a reservation which is within the limits of a State, and respecting which, or the indians occupying it, there are no special provisions granting or retaining jurisdiction in favor of the United States, or withdrawing the indians from the jurisdiction of the state, the state courts have jurisdiction and not the federal courts. (*State* v. *Ta-cha-na-tah,* 64 N. C. 614 ; *The Case of Peters,* 2 Johns. Cas. 344 ; *Jackson* v. *Goodell,* 20 Johns. 190.) The courts of the United States have no common law criminal jurisdiction. They only have such criminal jurisdiction as is given them by some law of the United States. (*Ex parte Sloan,* 4 Saw. 330.)

III. Nevada is not an indian country, and hence the federal courts have no jurisdiction of the offense. (*U. S.* v. *Sturgeon,* 6 Saw. 29.)

IV. It appears from the petition herein that the defendant had withdrawn himself from the tribe, and was, at the time of the commission of the offense, living among the whites, and hence is amenable to the criminal laws of this state. (2 Storey on Con. 655.)

V. An indian is a person, and, further, an indian is a human being. (See Stat. 1881, 29, 30 and 83 as to who

may be witnesses.) Section 2357, Comp. Laws, makes it an offense to kidnap an indian, and this court, in the case of *Lobdell* v. *Hall*, 3 Nev. 507, held that an indian, who had appropriated water on the public lands of the United States, might maintain an action for the diversion of that water as well as any other person. Now, if an indian is so recognized by our courts as to authorize him to institute a suit therein to enforce his rights, and he is permitted to testify in our courts, and our laws throw around him their protecting shield, can it be said, with any degree of justice, that he is not a person and a human being, capable of committing crime, and punishable therefor under our laws the same as any other person?

*Trenmor Coffin*, U. S. District Attorney; also, for Relator:

I. Between the state and federal courts must lie the jurisdiction of every case. The jurisdiction of the murder of one indian by another, or the trial or punishment of the offense cannot fall within the constitutional power of congress "to regulate commerce with the indian tribes." (Const. of the United States, art. I. sec. 8.) The trial of this offense, even when committed on an indian reservation is in terms excluded from the jurisdiction of the federal courts. (U. S. Rev. Stat. secs. 2145, 2146.) The term "indian country," as used in section 2145, has been construed to mean all lands within the United States to which the indian title has not been extinguished, or which is set apart for the exclusive use or occupation of the indians; *i. e.*, indian reservations. (*Bates* v. *Clark*, 95 U. S. 204; *U. S.* v. *Martin*, 8 Saw. 473.)

II. There never has been any treaty reservations with, or in favor of the Shoshones, reserving to them or recognizing any tribal jurisdiction of any offense committed by a member of the tribe. (See treaty between the United States and the western bands of the Shoshone indians, 18 U. S. Stat. at Large, 689, art. II. Treaty with the eastern band of the Shoshones, 15 U. S. Stat. at Large, 673, art. I.) Even if any such treaty stipulations had existed, they would

have been abrogated by the admission of Nevada into the Union, without a special exception or reservation, saving and preserving the provisions of the treaty. (*The Kansas Indians,* 5 Wal. 737; *The Cherokee Tobacco,* 11 Wal. 616; *United States* v. *McBratney,* 104 U. S. 621.) Long prior to the commission of the crime or the finding of the indictment set out in relator's petition, the United States had abandoned the policy of entering into any further treaty stipulations with the indians. (U. S. Rev. Stat. sec. 2079.)

III. By the admission of Nevada "into the Union upon an equal footing with the thirteen original states in all respects whatsoever," (13 U. S. Stat. at Large, 30, sec. 1, and 749, Proclamation No. 22), without any reservation or condition concerning the indians or the indian country, the state acquired absolute sovereignty and jurisdiction over them. The authorities supporting this doctrine, both national and state, are numerous and uniform, and are unequivocally against the jurisdiction of a federal court, and in favor of the sovereignty and jurisdiction of the state and state courts in cases such as presented by the petition of relator. (*U. S.* v. *Bailey,* 1 McLean 234; *U. S.* v. *Ward,* 1 Wool. 17; *U. S.* v. *Stahl,* 1 Wool. 192; *U. S.* v. *McBratney,* 104 U. S. 623; *U. S.* v. *Cisna,* 1 McLean 254; *Jackson* v. *Goodell,* 20 Johns. 192; *Goodell* v. *Jackson,* 20 Johns. 693; *Pollard's Lessee* v. *Hagan,* 3 How. 223; *U. S.* v. *Rogers,* 4 How. 572; *N. Y.* v. *Dibble,* 21 How. 366; *McCracken* v. *Todd,* 1 Kan. 148; *Clay* v. *State,* 4 Kan. 49; *People* v. *Godfrey,* 17 Johns. 225; *Murray* v. *Wooden,* 17 Wend. 531; *U. S.* v. *Bevans,* 3 Wheat. 388; *Com.* v. *Clary,* 8 Mass. 75; 2 Storey on the Con., Sec. 1227; *U. S.* v. *Sa-Coo-Da-Cot,* 1 Abb. U. S. 377; *Hicks* v. *Ewhartonah,* 21 Ark. 106; *Taylor* v. *Drew,* 21 Ark. 485; *State* v. *Harris,* 47 Wis. 298; *Painter* v. *Ives,* 4 Neb. 122; *People* v. *Antonio,* 27 Cal. 404; *U. S.* v. *Martin,* 8 Saw. 478.) There are some special exceptions where a state (Kansas) or a territory (Idaho) has not jurisdiction over indians and indian country (indian reservations and lands), but it is only where there was a special reservation or exception in the

act of congress organizing the territory or admitting the state into the Union. These exceptions prove the rule in the strongest possible manner. (*U. S.* v. *Ward*, 1 Wool. 17; *U. S.* v. *Stahl*, 1 Wool. 195; *The Kansas Indians*, 5 Wal. 737; *The New York Indians*, 5 Wal. 761; *Harkness* v. *Hyde*, 98 U. S. 477; *Langford* v. *Monteith*, 102 U. S. 146; *U. S.* v. *McBratney*, 104 U. S. 623.) I am unable to perceive any distinction between a case like the present, where the murder was committed by one indian upon another, and where a white man was murdered by an indian. The following were cases where one indian was murdered by another, and the courts held that there could be no such distinction: *State* v. *Foreman*, 8 Yer. 256; *State* v. *Hunt*, 4 Kan. 65; *State* v. *Tassels*, Dudley (Ga.) 229–38; *State* v. *Ta-Cha-Na-Tah*, 64 N. C. 614. This state has assumed and provided for the jurisdiction and trial by her district courts of every offense committed within her boundaries, including a murder of one indian by another. (Const. of Nev., Art. VI., sec. 6; 1 Comp. Laws, 933, 1711, 2321.)

*J. T. Lamb*, for Respondent:

I. The cases cited by relator's counsel have no application to the case under consideration.

II. The American indians have always sustained a peculiar relation to the United States and the several states of the Union. They are neither aliens or citizens, but independent tribes. In the management of their own internal affairs they are dependent on no power. They punish offenses under their own laws, and, in doing so, they are responsible to no power but their own. (*Worcester* v. *Georgia*, 6 Pet. 583, 595; *Cherokee* v. *Georgia*, 5 Pet. 7; *Goodell* v. *Jackson*, 20 John. 693.) The English government and the colonies always guaranteed the rights of the indians to self-government. (See the chronicles and treaties of those times.)

III. The constitution of the United States gives the power to congress to regulate commerce with the indian tribes. (Art. I, sec. 8.)

IV. The courts of the United States cannot punish the crimes of indians committed against other indians. (Intercourse act of 1834, sec. 25; Rev. Stat. secs. 2145, 2146.)

V. The rights of indians to self-government are not impaired by the statutes relating to territories. (Rev. Stat. sec. 1839.)

By the Court, LEONARD, J.:

Relator seeks by mandamus to compel respondent to proceed to the trial of a Shoshone indian named Spanish Jim, for the alleged murder of an indian girl in the town of Belmont, in Nye county, in March, 1883. Respondent admits that he is the duly elected and qualified judge of the fifth judicial district court; that said alleged crime was committed within the jurisdiction of said court, if at all; that the said Spanish Jim has been indicted by a lawful grand jury of Nye county, charged with the crime of murder, and that such indictment is now of record in the district court of the fifth judicial district, in and for Nye county. Respondent refuses to accept the plea of said Spanish Jim, or to try said cause, because the defendant is a Shoshone indian, born in subjection and obedience to his own tribal laws, and at the time the alleged offense was committed was living with the Shoshone tribe or nation, in subjection to, and recognizing the authority of, the chiefs and the laws of said tribe; and the indian girl alleged to have been killed was a Shoshone indian, born in subjection and obedience to said tribal laws, and was, at the time of the alleged killing, living with said tribe, in subjection to, and recognizing the authority of, the chiefs and laws thereof; that by reason of the foregoing facts, the fifth judicial district court, or judge thereof, has no jurisdiction of crimes committed by one indian against another when both are members of an organized tribe having laws for the government of their own internal affairs. Able arguments in support of relator's views of the law have been filed by the district attorney of Nye county, the attorney general of the state, and the United States district attorney for Nevada.

We have carefully examined all the authorities cited, which are numerous, as well as all others which an extended research has disclosed, and will now express our views upon the question presented.

Let it be remembered that what follows is intended to apply to the case before us, where one indian belonging to a tribe which is recognized and treated with as such by the government, having its chief and tribal laws, is accused of killing another of the same tribe ; and let it be borne in mind, especially, that what we say does not refer to a case where one indian injures the person or property of another not an indian, or *vice versa*. It does not refer to a case where an indian leaves his tribe and joins the whites. We entertain no doubt that the state courts, if any, have exclusive jurisdiction. In 1864 congress passed an act authorizing the inhabitants of that portion of the territory of Nevada described therein, to form for themselves, out of said territory, a state government, and providing that said state, when formed, should be admitted into the Union "upon an equal footing with the original states in all respects whatsoever." (Enabling act of congress, 13 Stat. at Large, 30.) The state was formed in pursuance of the provisions of the enabling act upon an equal footing with the original states. Upon these facts, the United States courts, at least, have not jurisdiction. (*U. S.* v. *Ward,* McCahon 199 ; *U. S.* v. *Ward,* Woolw. 21 ; *U. S.* v. *Yellow Sun,* 1 Dill. 272 ; *U. S.* v. *Cisna,* 1 McLean 254 ; *U. S.* v. *Stahl,* 1 Woolw. 192 ; *U. S.* v. *Martin,* 8 Saw. 473 ; *U. S.* v. *Bridleman,* 7 Saw. 243 ; *U. S.* v. *McBratney,* 104 U. S. 621 ; *U. S.* v. *Leathers,* 6 Saw. 17.)

Nor have we any doubt, should such a course be deemed advisable by the legislature, that the state courts may be given jurisdiction over crimes committed by one indian against the person or property of another indian, by extending the criminal laws over them. (*Caldwell* v. *State,* 1 Stew. & P. (Ala.) 327 ; *State* v. *Foreman,* 8 Yerg. 256 ; *U. S.* v. *Yellow Sun, supra ; State* v. *Tassels,* Dudley, (Ga.) 229.)

This, then, is the principal question presented for our con

sideration : Do our general laws upon crimes and their punishments apply, or were they intended to apply, to indians in the situation of the accused; or is it true that indians so situated are not amenable to those laws until they are made so by an affirmative act of the state legislature ? Although a state has the right and power to take jurisdiction in a given case, it cannot be exercised by courts, except in pursuance of a provision of the constitution that is self-acting, or an act passed by the legislature. The duty of courts is to expound and enforce laws. They cannot make them. Is there any law of this state to which the accused is amenable for the offense charged ? There is no statute extending the criminal laws over the indian tribes, or the individuals thereof. The statute under which the indictment was found is the general act concerning crimes and punishments, (Stat. 1861, 58,) which is as follows : "Murder is the unlawful killing of a human being with malice aforethought, either express or implied. Every person convicted of murder of the first degree shall suffer death, and every person convicted of murder of the second degree shall suffer imprisonment in the state prison for a term not less than ten years and which may be extended for life."

An indian is a human being and a person. The indian girl alleged to have been murdered was a human being, and the accused is a person. If we stick to the letter of the law we must find that the fifth judicial district court has jurisdiction. Our duty, however, is to ascertain the intention of the legislature in passing this law. In doing this we must follow certain well settled rules of construction that are peculiarly applicable to the present case. "The court should put itself in the position of the legislature—stand, in contemplating the statute, where the makers stood—the better to discover the reason and scope of the provision. They who voted for the measure must have had in mind a meaning for the enacted words ; and the meaning thus perceived must be given them by the court. If the statute is old, or if it is modern, the court should transport itself back to the time when it was framed, consider the condition of

things then existing, and give it the meaning which the language, as then used, and the other considerations, require. The court knowing the present law, knows also its history and the prior law. Such prior law, the legislature, being presumed to know it, must have had in mind in enacting the statute; therefore, in the construction, the court should take it into account. * * * They do not close their eyes to what they know of the history of the country and of the law, of the condition of the law at the particular time, of the public necessity felt, and other like things. * * * (Bish. Writ. Laws, sec. 75 *et seq.*) The exercise of even doubtful power will not be attributed to the legislature; therefore, construction will lean against it. (Id. 82.) The courts will presume the legislature intended its acts to be reasonable, constitutional and just; and when possible, consistently with any fair rendering of the words, will so construe them as not to make them otherwise. But this rule will not be carried to the extent of giving the enactment a meaning plainly repugnant to its terms.'' (Id. 90.)

The last sentence quoted is explained by the author under section one hundred and forty-five, where he says: '' Interpretation cannot, without sufficient indication in the words employed, aided by such surroundings as the law permits the court to look into, import words into the statute.''

Says the Court in *U. S.* v. *Kirby*, 7 Wall. 482: '' All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over the letter. The common sense of man approves the judgment mentioned by Puffendorf, that the Bolognian law, which enacted 'that whoever drew blood in the streets should be punished with the utmost severity,' did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit. The same common sense

accepts the ruling cited by Plowden, that the statute of 1 Edward II., which enacts that a prisoner who breaks prison shall be guilty of felony, does not extend to a prisoner who breaks out when the prison is on fire, 'for he is not to be hanged because he would not stay to be burnt.' "

Tested by the above and other well settled rules of construction, let us endeavor to ascertain whether in the passage of the general criminal statute under which the accused was indicted, the territorial legislature intended to include within its scope indians in his situation. If we find that such intention did not exist, then it will not be necessary to consider the question of power on the part of the legislature to do so, except so far as an examination of the latter question may assist us in arriving at a proper solution of the former. If the legislature did not intend to legislate concerning acts committed by one tribal indian against another, then the courts of this state have not jurisdiction of the present case, unless by the constitution, or some subsequent legislation, jurisdiction has been extended so as to include it. In other words, unaffected by any valid subsequent proceeding giving jurisdiction if the legislature of 1861 did not so intend, the statute must be construed as though indians like the accused had been excepted in terms. The indian question was deemed of such importance by congress, when Nevada was admitted as a territory in March, 1861, that in the organic act it was provided, " * * * that nothing in this act contained shall be construed to impair the rights of person or property now pertaining to the indians in said territory, so long as such rights shall remain unextinguished by treaty between the United States and such indians; * * * or to affect the authority of the government of the United States to make any regulations respecting such indians, their lands, property or other rights, by treaty, law or otherwise, which it would have been competent for the government to make if this act had never been passed." It also provided that the governor of the territory should perform the duties and receive the emoluments of the superintendent of indian

affairs; that the several counties should have representatives in the legislature in the ratio of their population, "indians excepted."

Section 6 provided that the legislative power of the territory should extend to all rightful subjects of legislation consistent with the provisions of that act; and by section 16 it was provided that the constitution and all laws of the United States which were not locally inapplicable, should have the same force and effect within the territory as elsewhere within the United States.

The conditions stated in the organic act were accepted by the territory, and the legislature had no right to pass laws in violation of their spirit. Courts must presume there was no intention to do so. Examining the organic act, we call attention, *first,* to the provision retaining the authority in the government to make any regulations respecting the indians in the territory, their lands, property, or other rights, by treaty, law, or otherwise, which it could have made if the act had not been passed, or, in other words, if the territory had not been organized. Expressed in a few words, the government, in terms, retained the right to conduct indian affairs, among themselves at least, in its own way, as has been its custom in forming temporary governments, as it was bound to do under the law. (U. S. Rev. Stats. secs. 1839, 1840.) If this power was retained as stated, it need not be said that the territory did not possess it. It could not be in both governments at once. (*The Kansas Indians,* 5 Wall. 755.)

It is not necessary to restate history here, in relation to the indian tribes. It is enough, perhaps, to say that, from the beginning, the government has pursued a policy concerning them that has been an exception to all other people of the earth. They have been its wards. We may admit that they might have been subjected to the same laws as have been passed for the government of other persons, but such has not been the policy adopted. They claimed the right of self-government in matters appertaining to themselves, and did not desire to become a part of the body

politic. They have had laws and chiefs of their own making and choosing, and their right to have them has been recognized by the constitution, the laws and treaties of congress, and the decisions of courts. Such was their condition when our organic act was passed; and, under the circumstances stated, if congress intended to permit the territory to do away with their cherished customs, to declare as to themselves what acts should constitute crimes, and prescribe punishments for the same, then it inserted, in a most important instrument, words which utterly failed to express its meaning. It *said* that all rights of person and property *then pertaining* to the indians of the territory should not be impaired so long as such rights should remain unextinguished by treaty, and that the government of the United States should have authority to make any regulations respecting such indians, their lands, property, or other rights, by treaty, law, or otherwise, which it might have made if the territory had not been formed. What rights of person and property did congress intend to preserve unimpaired? Evidently not those alone which had been established by treaty, because all the indians in the territory were included in the protecting clause, and not all the tribes had treaty rights. So far as we are advised, the first treaty with the Shoshones in Nevada was concluded in 1863. Congress could not have referred to treaty rights only. It did not intend to guard indians against lawlessness on the part of the territory. Surely, it could not have been considered necessary to provide against the commission of acts of violence upon their persons or property, for congress was dealing with a free people, capable of governing themselves, possessing intelligence and humanity, which are prerequisites in the formation and sustainment of enlightened governments.

In 1870 the senate judiciary committee, of which Mr. Carpenter was chairman, were instructed by resolution "to inquire into and report to the senate the effect of the fourteenth amendment to the constitution upon the indian tribes of the country; and whether, by the provisions

thereof, the indians are not citizens of the United States; and whether thereby the various treaties heretofore existing between the United States and the various indian tribes are or are not annulled.'' The report is No. 268, and is found in senate reports of the third session, forty-first congress. It commences by saying: '' That in the opinion of your committee the fourteenth amendment to the constitution has no effect whatever upon the *status* of the indian tribes within the limits of the United States, and does not annul the treaties previously made between them and the United States. The provisions of the amendment material to this question are as follows: ' All persons born or naturalized in the United States, *and subject to the jurisdiction thereof*, are citizens of the United States and of the states wherein they reside. Representation shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state, *excluding indians not taxed.*' The question is whether the indians are subject to the jurisdiction of the United States, within the meaning of this amendment, and the answer can only be arrived at by determining the *status* of the indian tribes at the time the amendment was adopted.''

The report is lengthy, learned and exhaustive, but we must content ourselves with short and unsatisfactory extracts therefrom. The committee say: '' The principle must now be recognized and acted upon, that the indians, after the European discovery and settlement of their domain, lost all sovereignty over it, retaining only the right of occupancy until their title should in some way be extinguished, and the right to regulate, without question, their domestic affairs, and make and administer their own laws, provided, in the exercise of such right, they should not endanger the safety of the governments established by civilized man. Beyond this limit the pretensions of European settlers never extended; but to this extent the principle referred to was recognized and enforced; and although the indians were thus overshadowed by the assumed sovereignty of the whites, it was never claimed or pretended that they had

lost their respective nationalities, their right to govern themselves, the immunity which belongs to nations in the conduct of war, or any other attribute of a separate political community."

They then quote from treaties, acts of congress, and decisions of United States and state courts, to prove that the policy of our government has been the same, and say : "In the opinion of your committee the constitution and the treaties, acts of congress, and judicial decisions, above referred to, all speak the same language upon this subject, and all point to the conclusion that the indians, in tribal condition, have never been subject to the jurisdiction of the United States, in the sense in which the term *jurisdiction* is employed in the fourteenth amendment to the constitution. The government has asserted a political supremacy over the indians, and the treaties and laws quoted from, present these tribes as ' domestic, dependent nations,' separated from the states of the Union, within whose limits they are located, and exempt from the operation of state laws, and not otherwise subject to the control of the United States than is consistent with their character as separate political communities or states. Their right of self-government, and to administer justice among themselves, after their rude fashion, even to the extent of inflicting the death penalty, has never been questioned ; and while the United States have provided by law for the punishment of crimes committed by indians upon white men lawfully within the reservations, the government has carefully abstained from attempting to regulate their domestic affairs, and from punishing crimes committed by one indian against another in the indian country. Volumes of treaties, acts of congress, almost without number, the solemn adjudications of the highest tribunal of the republic, and the universal opinion of our statesmen and people, have united to exempt the indian, being a member of a tribe recognized by, and having treaty relations with, the United States, from the operation of our laws and the jurisdiction of our courts. Whenever we have dealt with them it has been in their collective

capacity as a state, and not with their individual members, except when such members were separated from the tribe to which they belonged; and then we have asserted such jurisdiction as every nation exercises over the subjects of another independent sovereign nation entering its territory and violating its laws."

And in report No. 367, forty-third congress, first session, the committee on Indian affairs, to whom was referred the bill conferring exclusive jurisdiction upon the United States courts, and for the punishment of crimes committed by and against indians, reported as follows: " * * * That it is doubtful whether congress has power to confer exclusive jurisdiction upon the courts of the United States over indian reservations within the several states without their consent. This difficulty does not exist in the territories where the authority is ample and undisputed. * * * Your committee are further of opinion that the attempt to confer jurisdiction upon the courts of the United States, over offenses committed by one indian against the person or property of another, might lead to interminable litigation, and subject the government to great difficulty and expense in the determination of disputes which could more readily be adjusted by the agents and superintendents having the indians in charge. The indians, while their tribal relations subsist, generally maintain laws, customs, and usages of their own for the punishment of offenses. They have no knowledge of the laws of the United States, and the attempt to enforce their own ordinances might bring them in direct conflict with existing statutes, and subject them to prosecutions for their violation." (See, also, 2 Story Const. sec. 1933.)

Mr. Wharton, in his Conflict of Laws, under the head of "Adoption in a North American Indian Tribe," (sec. 252) says: "He (the person adopted) may be indicted, it is true, in state or territorial courts, for crimes committed by him on persons not of his tribe; but for offenses against members of his tribe, he is only justiciable before the tribal authorities. So far as concerns his domestic relations, he is

governed not by territorial, but by tribal law. * * * In short, while he retains his subjection to the territorial government (state or federal, as the case may be) in all that relates to transactions outside of the tribe ; so far as concerns transactions within the tribe, his allegiance is to the tribe, and he is governed exclusively by tribal law.''

The organic act for Idaho territory is precisely like ours upon this question. It contains the same provisos for the protection of indian rights ; the retention of the right of the government to make any regulations respecting the indians, their lands, property, or other rights ; and also that no territory shall be included therein, which by treaty with any indian tribe, is not, without consent of the tribe, to be included within the territorial limits or jurisdiction of any state or territory.

In *Langford* v. *Monteith*, 102 U. S. 147, after referring to the organic act, the court said : "This court, in *Harkness* v. *Hyde*, 98 U. S. 476, relying upon an imperfect extract found in the brief of counsel, inadvertently inferred that the treaty with the. Shoshones, like that with the Shawnees, contains a clause excluding the lands of the tribe from territorial or state jurisdiction. In this, it seems, we were laboring under a mistake. Where no such clause or language equivalent to it is found in a treaty with indians within the exterior limits of Idaho, the lands held by them are a part of the territory and subject to its jurisdiction ; *so that process may run there, however the indians themselves may be exempt from that jurisdiction.*'' The italics are ours.

In *Boyer* v. *Dively*, 58 Mo. 529, the court say : "The constitution of the United States, and the statutes passed in pursuance thereof, undoubtedly recognized the indian tribes as a peculiar people, having relations to the government totally different from citizens of the states. Although located within the state lines, yet, so long as their tribal customs are adhered to, and the federal government manages their affairs by agents, they are not regarded as subject to the state laws, so far, at least, as marriage, inheritance, etc., are concerned. * * * The customs and laws of the

indians, then, prevailed among the remnants of tribes in 1829 and 1830, and would continue unless positively changed by the legislature of the state. No such legislation was attempted, and it is useless to inquire if it had been, whether it would have been valid."

To the same effect are *Wall* v. *Williamson*, 8 Ala. (N. S.) 51 ; *Jones* v. *Laney*, 2 Tex. 348. See, also, *Fisher* v. *Allen*, 2 How. (Miss.) 611 ; *Dole* v. *Irish*, 2 Barb. 642 ; *Morgan* v. *McGhee*, 5 Humph. 14.

Again, the governor, by the organic act, was made superintendent of indian affairs throughout the territory. Under the law he performed such duties as were, or might be, assigned to him. (U. S. Rev. Stat. sec. 2050.) There were indian agencies in the territory. The limits of each agency was established by the secretary of the interior, either by tribes or geographical boundaries. (Id. sec. 2066.) It was each agent's duty, within his agency, to manage and superintend the intercourse with indians agreeably to law, and execute and perform such regulations and duties, not inconsistent with law, as might be prescribed by the president, secretary of the interior, the commissioner of indian affairs, or the superintendent of indian affairs. (Id. sec. 2058.) The president was empowered to discontinue any agency, or transfer it to such other place or tribe, as the public service might require. (Id. sec. 2059.) All persons employed in indian affairs were prohibited from having any interest or concern in any trade with the indians, except for, or on account of, the United States. (Id. sec. 2078. See, also, section 1840.) · Without making further references or quotations, we have shown, we think, that upon the admission of Nevada as a territory, the United States did not intend to yield or divide its authority over the indians in their domestic affairs; that the territorial legislature had no right to exercise it, and the presumption is that it did not intend to do so. That there was no such intent, is indicated by the history of the country at the time and subsequently.

In 1861 the indians here were savages in name and fact.

They were entirely unacquainted with the laws of civilized countries. They were governed by their own. Their wishes were not consulted in the making or execution of the laws. They eked out a miserable existence by hunting, fishing, begging, and sometimes stealing. They neither wanted, nor had intercourse with the whites. Some were peaceable, others aggressive and warlike. At times, subsequent to the passage of the crimes act, they stole bands of cattle and drove them away. They killed inoffensive white men. For these acts even, they were not apprehended and dealt with according to our laws, so far as we know, although they might have been. See memorial to congress by the legislature of 1862, (Stat. 1862, p. 196.) It admits of serious doubt, at least, whether it would be good policy even now to subject indians, as to their own matters, to our laws ; but it would be less open to objection now than it would have been in 1861. To have done so then would have been " cruel and absurd." (Whart. Confl. Laws, sec. 9.)

Mr. Otis, in his book on the Indian Question, published in 1878, concludes that we should sweep away the tribal organizations, and subject the indians to territorial law. But he admits that the codes of civilized states will not answer for this purpose. Commenting on his conclusions, Mr. Wharton, in a note at section 253, says: " Waiving the question of our right to destroy, under the constitution, tribal sovereignty, it will be a task exceedingly difficult to frame a code to which indians can be properly subjected."

It is a well known fact that from 1861 to the present time, as to crimes committed against each other, indians have not been subjected to our criminal laws. Eleven legislatures have met without endeavoring to change the practice. If petitioner's theory is correct, is it not strange that during all these years courts and grand juries have neglected to perform a sworn duty ? Is it not rational, at least, to conclude that their understanding has been that the general criminal laws were not intended to apply to such cases ? And, if this is so, should not the contemporaneous and

continuous construction of the statute by courts, grand juries, and legislatures, have great weight with courts in deciding the question now before us? The Shoshone indians, like other tribes, had and have their own laws and customs in constant exercise in relation to marriage and divorce. Polygamy is common among them. If so inclined they may have as many wives as their circumstances justify. (1 Bancroft's Native Races, 436.) Did the legislature of 1861 intend to bring them within the laws of marriage and divorce, husband and wife, and bigamy? We cannot think so. Our opinion is that congress intended to, and did, protect the indians in the right, then pertaining to them, of self-government in their domestic affairs. At any rate, as to any follies among themselves, or crimes committed by one against another, it proposed to pursue its own course, in its own way. The territory had a right to subject tribal indians, like other persons, to punishment for crimes against its own citizens. (Whart. Confl. Laws, 252.) This was necessary for its own protection, and the organic act did not forbid its exercise. Their right to self-government did not extend beyond acts among themselves. Undoubtedly, as before stated, the words of the statute under consideration are broad enough to include tribal indians; but the words "all" and "every" are often restrained in meaning by their context or by the general object of the provision. (Bish. Writ. Laws, sec. 102.)

In *Phillips* v. *State*, 15 Ga. 519, it is said: "True, it (the statute) says that in *all* cases where a levy is made, etc. One is amazed, in casting a glance over our statute book, to find how often this form of expression occurs, frequently signifying, as here, not absolutely all, but all of a particular class only. Indeed, it seems to be common to all writings, lay as well as legal, sacred as well as profane. And the generality of the phrase is frequently to be restrained in the act, not only by the context, but by the general form and scheme of the statute, as demonstrative of the intention of the legislature. Here it means, *in all cases* where the claimant is in possession of the property he shall

not be deprived of it, but it shall be left with him."

Without quoting therefrom, we make particular reference in this connection to *Kennedy* v. *Gies*, 25 Mich. 84 ; and see *Dano* v. *M. O. & R. R. Co.* 27 Ark. 565.

Here the word "every," as used in the general crimes statute of 1861, as to their domestic affairs, should not be held to include indians living in tribes recognized by the government and under the dominion of tribal laws. It is now necessary to consider whether or not the law remained the same at the time of the alleged homicide in this case. We have seen that the statute under which the indictment was found remains as it was when passed, and that we have no statute extending the laws of the state, civil or criminal, over the indians. At most, to the above statement, there is, so far as we know, but one exception, and that is the statute of 1881, (page 29,) permitting all persons of sound mind to become witnesses. It must be true, then, that prior to the adoption of our constitution, the criminal laws did not embrace offenses charged against indians in the situation of the accused. Was any change wrought by the constitution ? Section 2 of article XVII provides that "all laws of the territory in force at the time of the admission of this state, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or be altered or repealed by the legislature." The laws mentioned were to *remain in force.* They continued as they then were, having the same scope, force and effect; and there is no repugnancy between the statute as we interpret it and the constitution. There is nothing in the constitution indicating a desire on the part of the framers to bring tribal indians within the purview of the crimes act. They knew that the domestic affairs of indians had not been interfered with under the territorial government, and they expressed no dissatisfaction thereat ; but, on the contrary, they said this statute should remain in force until the legislature should change it. And should we look into the constitutional debates we should find nothing indicating such a desire. But, see Const. Deb. 145. Nor has anything been

done by the state legislature affecting the crimes act. In 1873, the legislature authorized certain state officers to contract for the purchase of Bonnifield & Healy's compilation. The object and effect of the compilation were, merely, to collect and arrange in convenient form the statutes then in force. No legislative action was taken upon each law contained therein, or upon the whole as collected and arranged. This is evident from the compiler's preface, the arrangements of the statutes, and the law authorizing a purchase. (Comp. Laws 4240.) Such has been the understanding of courts and attorneys and it is correct. · Constant reference is still made in practice to different statutes prior to 1873, as well as to the compiled laws.

Before closing this opinion it is proper to consider certain decisions relied on by counsel for petitioner in support of this application. With one exception, none of them will be found to conflict with this opinion. The many cases cited wherein indians were accused of committing crimes against white men, or the reverse, are not in point, of course, and in reading them this fact must be kept in mind. In passing, let us remark that if, under the facts of this case, the theory of petitioner is correct, it is a little strange that in all the books, in the multitude of cases that have arisen out of the indian question, only four have been found, by the industry of court and counsel, where one indian has been prosecuted for an act committed against the person or property of another.

The first is an able and exhaustive opinion in *State* v. *Foreman*, 8 Yerg. 256 ; but there is nothing in that which conflicts with the views here expressed. The state of Tennessee was admitted into the Union in 1796, "on an equal footing with the original states in all respects whatsoever." In 1833 the legislature extended the civil jurisdiction of several counties, so as, by the extension of the limits thereof, to include the country within the occupancy of the Cherokee indians which lay within the boundaries of the state. The statute also gave the courts jurisdiction of three crimes committed within the indian territory—murder, rape and

larceny; but allowed to the indians their usages and customs in all other respects. The question before the court was, whether the state legislature had power, under the treaties and laws of the United States, to pass the statute, and the court held that it had. There, there was a state law which, in terms, extended the state's jurisdiction over the indians in a state admitted on an equal footing with the original thirteen, without any restrictions in the act of admission. Here, there is no such law, and the general law was not intended to include tribal indians, like the accused. That case would be authority if our state legislature had extended the territorial crimes act, and the validity of the extending statute was now questioned.

In *State* v. *Tassels*, Dudley, (Ga.) the facts were the same substantially as in Foreman's case. It simply involved the validity of an act of the state of Georgia, one of the original thirteen, extending the laws of the state over the territory inhabited by the Cherokee indians and the indians themselves. (See *The Cherokee Nation* v. *Georgia*, 5 Pet. 1, and *Worcester* v. *State of Georgia*, 6 Pet. 515.)

In *State* v. *Ta-cha-na-tah*, 64 N. C. 614, the defendant, a Cherokee, was convicted of manslaughter in 1870, for killing another indian, and the supreme court held that Cherokee indians were subject to the criminal laws of the state. The point was disposed of in these few words: "*Prima facie*, all persons within the state are subject to the criminal laws and within the jurisdiction of the courts; if any exception exists it must be shown. On examination of the treaty of New Echotah, Georgia, on the twenty-ninth of December, 1835, between the United States and the Cherokee indians, we find that by article XII, it was provided that individuals and families who were averse to moving west of the Mississippi river, might remain and become citizens of the states where they resided. Our civil laws have been extended over these indians, at least, ever since 1838, (Rev. Code, ch. 50, sec. 16,) and this statute applies as well where the contract is between two indians as where one of the parties is white. (*Lovingood* v. *Smith*, 7 Jones 601.)

Unless expressly excepted, our laws apply equally to all persons, irrespective of race."

North Carolina was one of the original thirteen. When the revised code of that state was passed in 1838, under which the defendant was convicted, (Rev. Code, 203, 619,) the state had power, we presume, to include indians within the scope of its laws. No facts are stated showing that the legislature did not intend to do so ; but, on the contrary, section 16, chapter 50, referred to in the opinion, shows affirmatively that contracts with indians, and between indians, might be enforced if made in writing and subscribed by two witnesses. In 1838 the state was old, and the Cherokees were intelligent in comparison with our indians in 1861, or now. If the legislature of this state, having the right so to do, should now pass a crimes act, like the one in force, we might hesitate, at least, before declaring that the general words were not intended to include all persons. But, in ascertaining the legislative intent in enacting a law, there is a marked distinction between a statute passed when the legislative power so to do is unrestricted, and a similar one enacted while that power is curtailed. In one case the words used would be construed, ordinarily, according to their natural import, while, in the other it would be presumed, if possible, that the legislature did not intend to violate in spirit or letter the restricting provisions. The organic act provides that no tax shall be imposed upon the property of the United States. The legislature of 1861, in the revenue law, excepted such property from taxation. But if it had not done so, courts must have presumed that, in using the words " all property  *  *  *  shall be subject to taxation," it was not intended to tax the property of the United States, because such action would have been illegal. We do not think the North Carolina decision, rendered under the circumstances stated, militates against our views. The same is true of *State* v. *Doxtater*, 47 Wis. 278. Restrictions substantially like those in our organic act concerning indians, were placed upon Wisconsin when a territory, but they were taken off by the act ad-

mitting the state in 1846.   In 1849 the state legislature
repealed the territorial crimes act, and passed the one
contained in the revised statutes of Wisconsin for 1849.
(See pages 682, 747.)   Besides, in *Doxtater's* case, although
he was an indian, the woman with whom he was accused of
committing the crime charged, was a white person.

It must be conceded that the conclusion reached by the
court in *Hunt* v. *State*, 4 Kan. 60, decided in 1866, (before
the decisions in the *Kansas Indian Cases*, 5 Wall. 736,) is
opposed to ours.   In that case the defendant, a member of
the Wea tribe, killed another member of the same tribe.
This tribe, with others constituting what were known as the
" United Tribes," had a tribal government, and maintained
treaty relations with the United States.   The organic act
admitting the territory of Kansas in 1854, as well as the act
of admission as a state in 1861, contained provisos substan-
tially like those concerning indians in our organic act,
although the last-named act also declared that Kansas was ad-
mitted into the Union on " an equal footing with the original
states."   The statute under which Hunt was convicted was
a general law enacted by the territorial legislature, and the
constitution contained a provision continuing territorial laws
in force until they should expire by limitation, or be re-
pealed by the state legislature.   In 1860 all indians in Kan-
sas territory to whom lands had been set apart in severalty
or by families, and who had received patents therefor from
the United States, were, by legislative enactment, declared
to be citizens of the territory ; *provided*, nothing in said act
should be construed as conferring the right of suffrage on
any indian.   They were, however, authorized to sue and be
sued in all courts of law and equity.   (Acts of 1860, ch. 74.)
The Wea indians held their lands as stated in this statute.
(*Kansas Indians*, 5 Wall. 757.)   To what extent, if any,
the statute referred to, influenced the court, we are unable
to say.   But at any rate the decision was based solely upon
the proposition that indians, even as to acts affecting them-
selves only, were subject to the general criminal laws of the
state, just like people coming from foreign countries like

France, Spain and Portugal. With all respect to the
learned tribunal that rendered the decision, we suggest that
whether this proposition is true or not, depends upon many
facts and circumstances before referred to, which apparently
were not considered, and certainly not discussed.

In the case of *Blue Jacket* v. *Com'rs Johnson Co.*, 3 Kan.
299, the court decided that lands held by the Kansas in-
dians, including the Wea tribe, in severalty, under patents
from the government, were taxable. The case went to the
United States supreme court, where the judgment of the
state court was reversed. (*The Kansas Indians, supra.*)
This decision is referred to in *Doxtater's case, supra*, where
the court say: "There is, perhaps, some general lan-
guage used by Justice Davis in his opinion in the case of
*The Kansas Indians*, which seems to be in conflict with
the opinion above expressed; but this was a case simply
involving the right of the state of Kansas to tax the lands
of these indians, and the only point decided was that, the
state had no right, under the treaties with these indians,
to tax their lands, and what was said outside of this ques-
tion was *obiter*, and entitled only to that respectful consid-
eration which the opinion of the learned and experienced
judge demands of the court. The conclusion that indian
lands are not subject to taxation by the state, does not, by
any means, prove that indians themselves may not be sub-
ject to its criminal laws."

We admit that the only question before the court was,
whether the lands held in severalty by the united tribes,
under patents from the government, could be taxed. But,
in solving this question, the court was compelled to con-
sider, and did consider, the condition of the tribes, their
tribal rights under and outside of treaties, and the rights of
the state under the act of admission. What the court said
of the *status* of tribal indians, (page 755,) regardless of the
guarantees of any treaty, was by no means outside of the
case. It was stating a second reason why the indians in
Kansas could not be taxed. The case shows that there had
been two treaties with the indians; that of 1831, which pro-

vided that their lands should never be included within the boundaries of any state or territory, or subject to its laws, (page 739,) and that of 1854, which was silent upon this point (page 753.) We quote from the opinion: "Prior to the ratification of this treaty, (1854,) although not before it was signed, the organic act for the territory of Kansas was passed, and on the twenty-ninth of January, 1861, Kansas was admitted into the Union; but the rights of the indians, the power of congress over them, their lands and property, and the stipulations of treaties, were fully preserved and in the same words, both in the organic act and the act of admission of Kansas.    *    *    *    It is insisted, as the guarantees of the treaty of 1831 are not in express words re-affirmed in the treaty of 1854, they are, therefore, abrogated, and that the division of the Indian territory into separate estates so changes the *status* of the indians that the property of those who hold in severalty is liable to taxation. It is conceded that those who held in common cannot be taxed."

The court then expresses the opinion that it could not have been in the contemplation of the parties that such a distinction should exist, and says: "But it is not necessary to import the guarantees of the treaty of 1831 into that of 1854, in order to save the property of the entire tribe from state taxation. If the necessities of the case required us to do so, we should hesitate to declare that, in the understanding of the parties, the promises under which the treaty of 1831 were made, and the guarantees contained in it, were all abandoned when the treaty of 1854 was concluded. If the tribal organization of the Shawnees is preserved intact and recognized by the political department of the government as existing, then they are a people distinct from others, capable of making treaties, separated from the jurisdiction of Kansas, and to be governed exclusively by the government of the Union. If, under the control of congress, from necessity, there can be no divided authority; if they have outlived many things, they have not outlived the protection afforded by the constitution, treaties, and laws of congress.

It may be that they cannot exist much longer as a distinct people, in the presence of the civilization of Kansas; ' but until they are clothed with the rights, and bound to all the duties of citizens,' they enjoy the privilege of total immunity from state taxation. There can be no question of state sovereignty in the case, as Kansas accepted her admission into the family of states on condition that the indian rights should remain unimpaired, and the general government at liberty to make any regulations respecting them, their lands, property, or other rights, which it would have been competent to make if Kansas had not been admitted into the Union.  *  *  *  While the general government has a superintending care over their interests, and continues to treat with them as a nation, the state of Kansas is estopped from denying their title to it. She accepted this *status* when she accepted the act admitting her into the Union. Conferring rights and privileges on these indians cannot affect their situation, which can only be changed by treaty stipulation, or a voluntary abandonment of their tribal organization. As long as the United States recognizes their national character, they are under the protection of treaties and the laws of congress, and their property is withdrawn from the operation of state laws."

If by reason of the tribal organization of the Shawnees, recognized by the government, Kansas, under her act of admission, could not subject their property to taxation, because she accepted her admission on condition that the existing indian rights should remain unimpaired, and the general government be at liberty to make any regulations respecting rights of person and property, how can it be said that, under the same restrictions, rights of far greater value may be interfered with?

It is said by the United States district attorney that the first section of the civil rights bill (U. S. Rev. Stat. sec. 1977) gives the state courts jurisdiction in this case, independently of adjudicated cases. He admits that this statute was passed in pursuance of, and to carry out, the provisions of the fourteenth amendment to the constitution. It is as

follows: "All persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefits of all laws and proceedings for the security of persons and property, as is enjoyed by white citizens, and shall be subject to like punishments, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

It has never been decided, and probably will not be, that within the meaning of the fourteenth amendment, indians are "subject to the jurisdiction of the United States," and consequently citizens. (See senate report, No. 268, *supra*.) This statute, passed for the purpose of carrying out the provisions of the amendment, was not intended to include persons other than those referred to in the constitution. This is a sufficient answer to the claim made, regardless of the recent decision of the United States supreme court upon the civil rights bill, which is not before us. Our opinion is that the fifth judicial court has not jurisdiction to try the accused.

Mandamus denied.