[No. 2004]

## GOLDFIELD CONSOLIDATED MINES COMPANY, RESPONDENT, *v.* THE STATE OF NEVADA AND THE COUNTY OF ESMERALDA, APPELLANT.

1. CONSTITUTIONAL LAW—TAXATION—PATENTED MINING CLAIMS—ASSESSMENT—NET PRODUCTS.

   Article 10 of the constitution, as amended and ratified at the general election in 1906, provides (section 1) that the legislature shall provide for uniform and equal taxation and for a just valuation for taxation of all property, except mines and mining claims, when not patented, the proceeds alone of which shall be assessed and taxed; and, when patented, each patented mine shall be assessed at not less than $500, except when $100 in labor has been actually performed ·thereon during the year, in addition to the tax on the net proceeds, etc. Rev. Laws, 3621, provides that all property within the state shall be subject to taxation, except: "Second—Unpatented mines and mining claims; *provided,*" etc. *Held,* that where $100 worth or more of labor has been expended on a patented mining claim during any one year and prior to the time of assessment, the mine is exempt from taxation, except on the proceeds thereof.

2. CONSTITUTIONAL LAW—CONSTRUCTION.

   In the construing of constitutions or statutes the intention of the convention or the legislature controls, to be determined in accordance with established rules.

3. TAXATION—EQUALITY.

   A basic principle of all property taxation is that it shall be uniform and equal regardless of the method adopted to arrive at the result.

APPEAL from the Seventh Judicial District Court, Esmeralda County; *Peter J. Somers,* Judge.

Action by the Goldfield Consolidated Company against the State of Nevada and Esmeralda County to review the assessment of certain mining claims for taxation. From a ·judgment for plaintiff, defendants appeal. **Affirmed.**

The facts sufficiently appear in the opinion.·

*Cleveland H. Baker,* Attorney-General, and *J. Emmitt Walsh,* District Attorney of Esmeralda County, for Appellants:

In other states, where similar provisions prevail and similar exemptions exist, the courts have held that such

exemptions do not exist in favor of patented mining claims, but only in favor of unpatented mining claims. (*Waller* v. *Hughes,* 11 Pac. 122; *Salisbury* v. *Lane,* 63 Pac. 383.)

The plain language of the constitutional provision is decisive in showing that patented mining claims should be taxed, for, unless the legislative enactment, which was passed in 1909 to carry out the constitutional provision, specifically exempted patented mining claims from taxation, they do not come within the exemption when the statute states what property shall be exempt, and it is apparent that it never was the intention of the legislature, or the people, in adopting article 10 of the constitution, to exempt patented mining claims from taxation, but, on the contrary, it appears that the proceeds of the mines are subject to a bullion tax in addition to an assessment of not less than five hundred dollars on each patented claim, and therefore the assessment levied in this action should be held valid.

*Henry M. Hoyt,* for Respondent:

We maintain that the only change intended to be effected by this amendment was to cure a certain existing mischief, namely, the evil of allowing patented mining claims to be left unworked and exempt from taxation, resulting in unproductiveness and, in many instances, the impossibility of even finding out who are the owners. The remedy adopted to cure the mischief was to place an assessment and tax upon an unworked patented mining claim, so that if the owner did not care enough about his property to pay the tax, it could be knocked down at public sale to some one who, having thus acquired the title, could put the mining claim to some practical use. This is the historical and well-known basis for the constitutional amendment, and this is what the people of Nevada understood to be the purpose to be accomplished.

The legislative intent is very plain. The original constitutional provision (article 10) exempted both patented and unpatented mining claims from all taxes

except the tax upon proceeds. The new constitutional amendment left unpatented mining claims as they were before, because the legislature and the people realized that the United States statutes require one hundred dollars worth of work annually upon each unpatented claim.

*Per Curiam:*

This appeal presents the sole question: Is a patented mining claim, on which there has been expended one hundred dollars or more in labor during the year, subject to assessment and taxation in addition to the tax on its net products?

[1] Article 10 of the constitution, as amended by the legislature and ratified by the people at the general election in 1906, reads:

"SECTION 1. The legislature shall provide by law for a uniform and equal rate of assessment and taxation, and shall prescribe such regulations as shall secure a just valuation for taxation of all property, real, personal and possessory, except mines and mining claims, when not patented, the proceeds alone of which shall be assessed and taxed, and when patented, each patented mine shall be assessed at not less than five hundred dollars ($500) except when one hundred dollars ($100) in labor has been actually performed on such patented mine during the year, in addition to the tax upon the net proceeds; and also excepting such property as may be exempted by law for municipal, educational, literary, scientific or other charitable purposes."

As originally adopted by the constitutional convention and ratified by the people in 1864, the article read:

"SECTION 1. The legislature shall provide by law for a uniform and equal rate of assessment and taxation and shall prescribe such regulations as shall secure a just valuation for taxation of all property, real, personal, and possessory, excepting mines and mining claims, the proceeds of which alone shall be taxed, and also excepting such property as may be exempted by law for municipal,

educational, literary, scientific, religious or charitable purposes." (Rev. Laws, 352.)

An amendment to article 10, proposed and passed by the legislatures of 1899 and 1901, inserted the following provision in the body of the original section: "But the acreage of patented mining claims shall also be assessed at a valuation of ten dollars per acre." The vote of the electors at the general election of 1902, in ratifying this amendment, does not appear with certainty to have been officially canvassed, although the book of election returns in the office of the secretary of state appears to show that it received a majority of the votes cast. This amendment, however, is unimportant, save as it may throw some light on the proper construction of the article as it now exists by the amendment approved in 1906.

The legislature of 1909 amended section 5 of the general revenue act (Rev. Laws, 3621) so as to read: "All property of every kind and nature whatsoever, within this state, shall be subject to taxation, except * * * Second— Unpatented mines and mining claims; *provided,*" etc.

Prior to the amendment of 1909, *supra,* the exception read: "Second—Mines and mining claims; *provided,*" etc.

Was the purpose designed to be accomplished by the amendment of article 10 as it now exists to exempt entirely patented mines and mining claims from assessment and taxation, otherwise than upon the net proceeds, where one hundred dollars or more of labor had been expended upon the same during the year; or was it intended that such expenditure might be taken into consideration in making the assessment, and, when made, permit, but not require, a lower assessment than the minimum otherwise required to be assessed? It is appellants' contention that the letter of the provision supports the latter construction. But when the article is considered as a whole, taken in connection with the general policy of the state since its organization, the reasons which prompted the amendment, and what may be done under the provisions of the section in the event such a construction is held to be the proper one, can it be said that such

construction is in consonance with the evident intent of the legislature in adopting, and the people in ratifying, the amendment?

This amended section of the constitution first provides for a uniform and equal rate of assessment and taxation of all property, except mines and mining claims, and then provides that the proceeds alone of these, when not patented, shall be assessed and taxed; and the words, "and, when patented, each patented mine shall be assessed at not less than five hundred dollars except when one hundred dollars in labor has been actually performed on such patented mine during the year, in addition to the tax on the net proceeds," we think, mean that patented mines shall be assessed at not less than five hundred dollars, if one hundred dollars in labor has not been actually performed upon such patented mine during the year; but if such labor is so performed upon a patented mine it becomes exempt from assessment and taxation, except on the net proceeds, the same as an unpatented claim.

There is nothing in the language of the amendment specifically directing that patented mines shall be assessed for less than five hundred dollars, or at all, if the one hundred dollars worth of annual labor is performed. Evidently the purpose of the legislature was to stimulate the prospecting of patented mines, and not encourage the owners to have them lie dormant and unprospected, and to require them to pay a tax if they did not do the one hundred dollars worth of annual labor, but to exempt them from this tax if they did perform the labor, as an incentive for performing labor, instead of paying the tax. This construction, we believe, is not only in consonance with the language of the amendment, but it is in accordance with the policy of the state regarding the development of its mineral resources. But conceding, for the purposes of this case, that the literal construction of the section is as contended by appellants, nevertheless such a construction should not be adopted, as it would violate the manifest intent of the legislature in adopting, and the people in ratifying, the amendment.

[2] This court in a number of cases has had occasion to consider the rules which should control in the construction of constitutional provisions.

In *State* v. *Kruttschnitt*, 4 Nev. 201, Beatty, C. J., delivering the opinion of the court, said: "There can be no doubt but that whenever the interpretation of a statute or a constitution in a certain way will result in manifest injustice courts will always scrutinize the act or constitution closely to see if it will not admit of some other interpretation; for it is not to be supposed that any legislative body passes an act for the purpose of doing a manifest wrong." In *Clarke* v. *Irwin*, 5 Nev. 121, this court, by Whitman, J., said: "When words are used in a constitution, unless so qualified by accompanying language as to alter their ordinary and usual meaning, they must be received in such meaning."

In *Lewis* v. *Doron*, 5 Nev. 411, the court quoted with approval from the Court of Appeals of New York the following: " 'Whether we are considering an agreement between parties, a statute, or a constitution, with a view to its interpretation, the thing we are to seek is the thought which it expresses. To ascertain this, the first resort in all cases is to the natural signification of the words employed, in the order and grammatical arrangement in which the framers of the instrument have placed them. If, thus regarded, the words embody a definite meaning which involves no absurdity, and no contradiction between different parts of the same writing, then that meaning apparent upon the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed. In such a case there is no room for construction. That which the words declare is the meaning of the instrument; and neither courts nor legislatures have the right to add to or take away from that meaning. This is true of every instrument; but when we are speaking of the most solemn and deliberate of all human writings, those which ordain the fundamental law of states, the rule rises to a very high degree of significance. It must be very plain—nay, absolutely certain—

that the people did not intend what the language they have employed, in its natural signification, imports, before a court will feel itself at liberty to depart from the plain reading of a constitutional provision.' (*Newell* v. *People,* 3 Seld. 97.)"

In the case of *State* v. *Dovey,* 19 Nev. 399, Leonard, C. J., delivering the opinion of the court, said: "In construing constitutions and statutes, the first and last duty of courts is to ascertain the intention of the convention and legislature; and in doing this they must be governed by well-settled rules, applicable alike to the construction of constitutions and statutes. 'All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language which would avoid results of this character.' (*U. S.* v. *Kirby,* 7 Wall. 482, 19 L. Ed. 278.) And see *State* v. *McKenney,* 18 Nev. 189; *State* v. *Kruttschnitt,* 4 Nev. 178."

If such a construction of the constitutional provision contended for by the appellants were to be conceded and adopted, then a patented mine could be assessed for its full value, notwithstanding it is also required to pay a tax on its net proceeds. In other words, a patented mine which may justly be valued at a million dollars may be subject to assessment at any figure between one dollar and a million dollars, and the assessment be within the language of the section, regardless of what tax may have been paid on the net proceeds. Under such construction of the language contended for, double taxation, or at least an unequal or unjust burden of taxation, may be imposed on a mine that has a large net product, which consequently gives to the mine itself a high valuation.

Then, also, it is difficult to see how any uniform system of assessing mining property, under this view, could be enforced in the several counties; for the assessing officers of one county might assess the patented mines at their full value, in addition to the tax on the net income, while the revenue officers of another county might fix but a

nominal valuation on the patented mine. An intention to effectuate such a possibility ought not to be imputed to the legislature, in view of other matters which may properly be considered in arriving at the legislative intent.

At the time of the adoption of the state constitution (1864) the federal mining laws had not been adopted, and patented mines had not come into existence. Mining claims were then held in accordance with the rules and customs of miners, and their possessory rights were recognized by the federal government. The way in which mining property was then held is referred to at some length in the case of *Golden* v. *Murphy*, 31 Nev. 410.

Under the territorial laws the possessory rights of miners were held to be subject to taxation. (*Hale & Norcross Mining Co.* v. *Storey County*, 1 Nev. 104.) The constitution for the State of Nevada proposed by the first constitutional convention, which met in 1863, contained a provision for the taxation of mines. This provision was strenuously opposed by the representatives of mining sections, led by Hon. Wm. M. Stewart, whose speech in opposition to the section, as reported by Mark Twain for the *Territorial Enterprise*, first attracted public attention to the literary ability of the latter. Stewart opposed the adoption of the constitution because of this feature, and to the power of his appeal against taxing "the poor miners' shafts and drifts and bedrock tunnels" is credited in part the defeat of the constitution. A reference to the constitutional debates in the convention which proposed the present constitution discloses that the reaching of an agreement as to the method of taxing mines occupied a large portion of the time of the convention, with the result that a provision for taxing the proceeds of mines only was adopted.

By reference to the constitutions and statutes of the western mining states and territories, it will be observed that two general systems of taxation of mines have been in vogue—one the taxing of mines as real property, and the other the taxing of the proceeds of the mines.

Nevada was the first state to adopt the system of taxing the proceeds only. The Colorado constitution provided that for the first ten years following the adoption of the constitution the proceeds of mines only should be taxed; thereafter such property to be taxed as other real property. The constitutions of Montana and Utah are identical in providing that a tax shall be imposed on the proceeds of mines, and, in the case of patented mines, an additional tax per acre at the same amount as the land is sold by the general government. By the constitution of Idaho, mines are taxed as real property. In none of these states can there be found any provisions which would authorize a virtual double taxation on the actual value of mines. The nominal tax of $5 per acre (the amount charged by the government for the sale of mineral land) does not affect the principle upon which the mines are assessed for revenue purposes. The first proposed amendment to article 10 of the constitution of this state, providing for an assessment of patented mines at $10 per acre, referred to *supra*, was, in principle, the same as the existing provisions of the Montana and Utah constitutions. A tax based on the acreage of a patented mine at a fixed nominal amount, in the case of a producing mine, is usually inconsiderable when compared with the tax on the proceeds; and it is this latter tax which is regarded as the substantial revenue-producing tax, so far as mines are concerned, in states where this system of taxation is recognized.

[3] A basic principle of all property taxation is that it should be uniform and equal, regardless of the method adopted to arrive at the result. This court, in *City of Virginia* v. *Chollar-Potosi M. Co.*, 2 Nev. 92, considering the provisions of article 10 of the constitution, by Beatty, J., said: "The leading feature of this section is that the taxation shall be equal and uniform, and that the proceeds of the mines only shall be taxed. In other words, whilst the body of the mine remains untaxed, the ore taken out (for that is the primary proceeds of the mine) shall be subject to the same *ad valorem* taxation as other property."

We do not think the legislature in proposing, or the people in adopting, the amendment to the section of the constitution under consideration had any intention of changing "the leading feature of this section."

The provision in the exception to the requirement that patented mines be assessed at not less than five hundred dollars, relative to the performance of one hundred dollars in labor during the year, throws light, we think, on what was the legislative intent. In order that an unpatented mining claim may not be subject to forfeiture and the rights of the owner cut off by a subsequent location, the federal laws require that one hundred dollars be annually expended thereon for labor or improvements. As long as this annual expenditure is made, the rights of the owner of an unpatented mine are as secure as though the same were patented. The mine owner may extract and receive the benefit of every pound of ore in the mine and leave the same valueless without ever perfecting a patent to the property. Should the owner fail for a year to do his so-called annual assessment work, another may go upon and relocate the ground and become entitled to the possession thereof, but not so in the case of a patented mine. This leads to the underlying reason for attempting to amend the section. Following the adoption of the federal mining laws, numerous mines were patented in the various mining districts throughout the state. Many of these patented claims were never extensively worked, or, if worked at all at one time, work thereafter ceased. In the lapse of years, owners of these patented claims had in many instances either died or left the state. The claims were apparently abandoned. Not being subject to any assessment, they could not be sold for taxes, and title in another thereby acquired. Not being able to find the owners, persons desiring to work these claims could not obtain title thereto, except possibly through an adverse possession for two years, taking the chance that if a valuable mine were developed in the meantime the owner or some heir or grantee might appear in the last hour and oust the intruder of his

possession. The state was interested in having these abandoned mines developed; for both by legislative enactment and judicial decree mining was declared to be the paramount industry in the state. A tax upon patented mines was deemed to be a solution of the vexed question.

It is a matter of common knowledge that this is the historical reason for the amendments proposed. While the language used is not the clearest to express the intent, and while the letter of the language may permit of a different construction, one, however, which would make it possible to violate a fundamental principle of taxation—that of uniformity and equality—nevertheless, from all the considerations mentioned, we think the intent of the amendment was to put patented and unpatented mines upon an equality, so far as taxation was concerned, to wit, that when one hundred dollars in labor had been expended upon a patented mine it should, so far as taxes were concerned, be in the same position as an unpatented mine, upon which the same amount was required to be expended to maintain its existence without liability to forfeiture.

It is our conclusion, therefore, that as one hundred dollars in labor had been actually performed on the several patented mines designated in the complaint during the fiscal year and prior to the time of the assessment that the said mines were exempt for the year from the assessment imposed, and the same was void.

The judgment is affirmed.