72 U.S. 737 (____)
5 Wall. 737
THE KANSAS INDIANS
Supreme Court of United States.

*751 On the cases coming here, the whole three were argued by Mr. T.A. Hendricks, for the plaintiffs in error, and by Mr. E.P. Stanton, contra.
Mr. Justice DAVIS delivered the opinion of the court in all three of the cases; a separate opinion in each.

IN THE CASE OF THE SHAWNEES.
The sole question presented by this record is, whether the lands belonging to the united tribe of Shawnee Indians, residing in Kansas, are taxable?
*752 The authorities of the county of Johnson asserting the right, and the highest court of the State having sustained it, the question is properly here for consideration. The solution of it depends on the construction of treaties, the relations of the general government to the Indian tribes, and the laws of Congress. In order to a proper understanding of the rights of these Indians, it is necessary to give a short history of some of the treaties that have been made with them.
In 1825 the Shawnee tribe was divided  part being in Missouri and part in Ohio. The Missouri Shawnees were in possession of valuable lands near Cape Girardeau, and in that year[*] ceded them, by treaty, to the United States, and, in consideration of the cession, received for their use, and those of the same nation in Ohio, who chose to join them, a tract of country in Kansas, embracing fifty square miles. In pursuance of the favorite policy of the government to persuade all the Indian tribes east of the Mississippi to migrate and settle on territory, to be secured to them, west of that river, in 1831,[] a convention was concluded with the Ohio Shawnees  they being willing to remove West, in order to obtain "a more permanent and advantageous home for themselves and their posterity." In exchange for valuable lands and improvements in Ohio, they obtained, by patent, in fee-simple to them and their heirs forever, so long as they shall exist as a nation, and remain upon the same, one hundred thousand acres of land, to be located under the direction of the President of the United States, within the tract granted in 1825 to the Missouri Shawnees.
This treaty contained words of promise that the same care, superintendence, and protection, which had been extended over them in Ohio, should be assured to them in the country to which they were to remove, and also a guarantee that their lands should never be within the bounds of any State or Territory, nor themselves subject to the laws thereof. In obedience to the obligations of this treaty, they *753 removed and united with their brethren, who had preceded them from Missouri, but were soon met by the advancing tide of civilization. In view of the rapid increase of population in the Kansas country, and the small number of Shawnees  the tribe does not now contain over twelve hundred souls  it was deemed advisable to lessen their territorial limits.
Accordingly another treaty was concluded with them on the 2d day of November, 1854.[*] By this treaty the united Shawnee nation ceded to the United States all the large domain granted to them by the treaty of 1825. In consideration for this cession, two hundred thousand acres of these same lands were receded to them, and they also obtained annuities and other property. This treaty was peculiar in some of its provisions. It did not contemplate that the Indians should enjoy the whole tract, as the quantity for each individual was limited to two hundred acres. The unselected lands were to be sold by the government, and the proceeds appropriated to the uses of the Indians. It also recognized that part of the lands selected by the Indians could be held in common, and part in severalty. If held in common, they were to be assigned in a compact body; if in severalty, the privilege was conceded of selecting anywhere in the tract outside of the common lands.
The Indians who held separate estates were to have patents issued to them, with such guards and restrictions as Congress should deem advisable for their protection. Congress afterwards[] directed the lands to be patented, subject to such restrictions as the Secretary of the Interior might impose; and these lands are now held by these Indians, under patents, without power of alienation, except by consent of the Secretary of the Interior. This treaty was silent about the guarantees of the treaty of 1831; but the Shawnees expressly acknowledged their dependence on the government of the United States, as formerly they had done, and invoked its protection and care. Prior to the ratification of this treaty *754 (although not before it was signed) the organic act for the Territory of Kansas was passed, and on the 29th of January, 1861, Kansas was admitted into the Union; but the rights of the Indians, the powers of Congress over them, their lands, and property, and the stipulations of treaties, were fully preserved, and in the same words, both in the organic act and the act for the admission of Kansas.
The Ohio Shawnees, when they ceded their lands in Ohio, did it in pursuance of an act of Congress of May 28, 1830,[*] which assured them the country to which they were translated should be secured and guaranteed to them and their heirs forever. The well-defined policy of the government demanded the removal of the Indians from organized States, and it was supposed at the time the country selected for them was so remote as never to be needed for settlement. This policy was deemed advantageous to their interests, as it separated them from the corrupting influences of bad white men, and secured for them a permanent home. It is plain to be seen, that the covenants with the Shawnees in the treaty of 1861, that they should not be subject to the laws of organized States or Territories, nor their lands included within their boundaries, unless with their own consent, signified to the President, must have materially influenced their decision to part with their Ohio possessions and join their brethren in Kansas. They, therefore, removed under the assured protection of the government, to enjoy, as they expected, in perpetuity, free from encroachment, a home adapted to their habits and customs. But these expectations were not to be realized, for the spirit of American enterprise, in a few years, reached their country, and the same white population that pressed upon them in Ohio and Missouri followed them there.
The present and future wants of this population created the necessity for the treaty of 1854, and the segregation of lands allowed by it, in connection with the power to sell these unselected tracts, invited what followed  a mixed occupancy *755 of the same territory by the red and white men  the very matter which dictated the removal of the Indians from the older States.
It is insisted, as the guarantees of the treaty of 1831 are not, in express words, reaffirmed in the treaty of 1854, they are, therefore, abrogated, and that the division of the Indian territory into separate estates, so changes the status of the Indians that the property of those who hold in severalty is liable to State taxation. It is conceded that those who hold in common cannot be taxed. If such are the effects of this treaty, they were evidently not in the contemplation of one of the parties to it, and it could never have been intended by the government to make a distinction in favor of the Indians who held in common, and against those who held in severalty. If the Indians thus holding had less rights than their more favored brethren, who enjoyed their possessions in common, and in compact form, would not good faith have required that it should have been so stated in the treaty? The general pledge of protection substantially accorded in this treaty, as in all the other treaties with this tribe, forbids the idea that government intended to withdraw its protection from one part of the tribe and extend it to the other.
But, it is not necessary to import the guarantees of the treaty of 1831 into that of 1854, in order to save the property of the entire tribe from State taxation. If the necessities of the case required us to do so, we should hesitate to declare that, in the understanding of the parties, the promises under which the treaty of 1831 were made, and the guarantees contained in it, were all abandoned when the treaty of 1854 was concluded. If the tribal organization of the Shawnees is preserved intact, and recognized by the political department of the government as existing, then they are a "people distinct from others," capable of making treaties, separated from the jurisdiction of Kansas, and to be governed exclusively by the government of the Union. If under the control of Congress, from necessity there can be no divided authority. If they have outlived many things, they have not outlived the protection afforded by the Constitution, *756 treaties, and laws of Congress. It may be, that they cannot exist much longer as a distinct people in the presence of the civilization of Kansas, "but until they are clothed with the rights and bound to all the duties of citizens," they enjoy the privilege of total immunity from State taxation. There can be no question of State sovereignty in the case, as Kansas accepted her admission into the family of States on condition that the Indian rights should remain unimpaired and the general government at liberty to make any regulation respecting them, their lands, property, or other rights, which it would have been competent to make if Kansas had not been admitted into the Union. The treaty of 1854 left the Shawnee people a united tribe, with a declaration of their dependence on the National government for protection and the vindication of their rights. Ever since this their tribal organization has remained as it was before. They have elective chiefs and an elective council; meeting at stated periods; keeping a record of their proceedings; with powers regulated by custom; by which they punish offences, adjust differences, and exercise a general oversight over the affairs of the nation. This people have their own customs and laws by which they are governed. Because some of those customs have been abandoned, owing to the proximity of their white neighbors, may be an evidence of the superior influence of our race, but does not tend to prove that their tribal organization is not preserved. There is no evidence in the record to show that the Indians with separate estates have not the same rights in the tribe as those whose estates are held in common. Their machinery of government, though simple, is adapted to their intelligence and wants, and effective, with faithful agents to watch over them. If broken into, it is the natural result of Shawnees and whites owning adjoining plantations, and living and trafficking together as neighbors and friends. But the action of the political department of the government settles, beyond controversy, that the Shawnees are as yet a distinct people, with a perfect tribal organization. Within a very recent period their head men negotiated a treaty with the *757 United States, which, for some reason not explained in the record, was either not sent to the Senate, or, if sent, not ratified, and they are under the charge of an agent who constantly resides with them. While the general government has a superintending care over their interests, and continues to treat with them as a nation, the State of Kansas is estopped from denying their title to it. She accepted this status when she accepted the act admitting her into the Union. Conferring rights and privileges on these Indians cannot affect their situation, which can only be changed by treaty stipulation, or a voluntary abandonment of their tribal organization. As long as the United States recognizes their national character they are under the protection of treaties and the laws of Congress, and their property is withdrawn from the operation of State laws.
It follows, from what has been said, that the Supreme Court of Kansas erred in not perpetuating the injunction and granting the relief prayed for.

IN THE CASE OF THE WEAS.
The opinion just rendered in the case of Blue Jacket, representing the united tribe of Shawnee Indians, controls the decision of this case. The relations of the general government to the Wea tribe, and their relations to the State of Kansas, are settled by the agreed statement of facts in the record, in connection with the treaty of 10th August, 1854.[*] This tribe being weak in numbers, united with three other tribes, equally weak, and ceded to the United States large possessions obtained under former treaties, reserving for each individual only one hundred and sixty acres of land, and ten sections for the common property of the united tribes, with one section in addition, for the American Indian Mission Association. The reservation of the limited quantity for each individual was not to be in a compact body. Individuals *758 and heads of families had the right of selection, as in the Shawnee treaty, and the lands were to be patented, with restrictions upon alienation, as the President or Congress should prescribe. The unselected lands were to be sold, and the proceeds paid over to the Indians. This policy produced, as in the case of the Shawnees, a mixed occupancy of the original Indian territory, and, in consequence, the same difficulties. These difficulties must have been foreseen by the people of Kansas and the general government, but could not have been within the apprehension of the limited intelligence of the Indians. The basis of the treaty, doubtless, was, that the separation of estates and interests, would so weaken the tribal organization as to effect its voluntary abandonment, and, as a natural result, the incorporation of the Indians with the great body of the people.
But this result, desirable as it may be, has not yet been accomplished with the Wea tribe, and, therefore, their lands cannot be taxed. It is conceded, that the tribal organization is kept up and maintained in the county of Miami, where they live, and where the annuities are paid to them, under the supervision of the Indian agent of the tribe. And it is further conceded, that the chiefs and head men of the tribe, represent it and transact its business, receive funds from the United States for tribal purposes and disburse it, and that an agent for the tribe resides in the county, where he transacts the business of the United States with the tribe through their chiefs and head men. These concessions place the Wea Indians in the same category with the Shawnees.
It is argued, because the Indians seek the courts of Kansas for the preservation of rights and the redress of wrongs, sometimes voluntarily, and in certain specified cases by direction of the Secretary of the Interior, that they submit themselves to all the laws of the State. But the conduct of Indians is not to be measured by the same standard, which we apply to the conduct of other people. Kansas is not obliged to confer any rights on them. Because a sound policy may dictate the wisdom of treating them, in some *759 respects, as she treats her own citizens, and thereby weaning them from the ancient attachment to their own customs, they are none the less a separate people, under the protection of the general government. This policy may eventually succeed in disbanding the tribe, but until it does, the Indians cannot look to Kansas for protection, nor can the general laws of the State taxing real estate within its limits reach their property.
But, it is said, the protection promised the Shawnees is not accorded to the Weas, in the treaty of August, 1854. Not so, for in the tenth article, they agree "to commit no wrong on either Indian or citizen; and if difficulties should arise, to abide by the laws of the United States in such cases made and provided, as they expect to be protected and have their rights vindicated by those laws." Did not the government accord to them the protection invoked, by executing the treaty? It surely did not need that the United States should say in words, we agree to protect you and vindicate your rights. But the 11th article fixes beyond dispute the reciprocal relations of the general government and these Indians. It declares the object of the treaty is to advance the interests of the Indians; and if it should prove ineffectual, "it was agreed that the President, with the advice and consent of the Senate, should adopt such policy in the management of their affairs as in his judgment should be proper, or Congress might make such provision by law as experience should prove to be necessary." How far the powers of the President or Congress extend under this article, it is unnecessary to discuss or decide. It is sufficient to say, that it leaves the Indians most clearly under the protection of the general government, and withdraws their property from the jurisdiction of Kansas.

IN THE CASE OF THE MIAMIS.
The principle of the foregoing cases of the Shawnee and Wea tribes of Indians, is also decisive of this controversy. The Miami tribe hold their head rights in severalty, by vir *760 tue of the provisions of the treaty which was proclaimed by the President on the 4th of August, 1854.[*]
It is unnecessary to pursue the history of this tribe through the various treaties which have been concluded between them and the United States. It is sufficient to state that they are a nation of people, recognized as such by the general government in the making of treaties with them, and the relations always maintained towards them, and cannot, therefore, be taxed by the authorities of Kansas. Their tribal organization is fully preserved, and they are under the supervision of an agent, who resides in the county where their lands are situated. It is not necessary to decide, until the question arises, what powers have been conferred on Congress, or the President, by virtue of the 11th article of the treaty of 1854, being the same as the 11th article of the Wea treaty. There is, however, one provision in the Miami treaty  being in addition to the securities furnished the Shawnees and Weas  which, of itself, preserves the Miami lands from taxation. This particular provision exempts the lands from "levy, sale, execution, and forfeiture." It is argued, that these words refer to a levy and sale under judicial proceedings, but such a construction would be an exceedingly narrow one, whereas enlarged rules of construction are adopted in reference to Indian treaties. In speaking of these rules, Chief Justice Marshall says: "The language used in treaties with the Indians shall never be construed to their prejudice, if words be made use of which are susceptible of a more extended meaning than their plain import as connected with the tenor of their treaty."[]
Applying this principle to the case in hand, is it not evident that the words "levy, sale, and forfeiture" are susceptible of a meaning, which would extend them to the ordinary proceedings for the collection of taxes? Taxes must be first levied, and they cannot be realized without the power of sale and forfeiture, in case of non-payment. The position, it seems to us, is too plain for argument. The object of the *761 treaty was to hedge the lands around with guards and restrictions, so as to preserve them for the permanent homes of the Indians. In order to accomplish this object, they must be relieved from every species of levy, sale, and forfeiture  from a levy and sale for taxes, as well as the ordinary judicial levy and sale.
The judgment of the Supreme Court of Kansas in all three cases was REVERSED, and the causes remanded, with directions to enter a judgment in conformity with the opinions above given in the several cases.
NOTES
[*] 7 Stat. at Large, 284.
[] Id. 355.
[*] 10 Stat. at Large, 1063.
[] 11 Id. 430.
[*] 4 Stat. at Large, 411.
[*] 10 Stat. at Large, 1082.
[*] 10 Stat. at Large, 1093.
[] 6 Peters, 582.