Howry, J.,
delivered the opinion of the court:
The plaintiffs, ninety in number, are of the Pottawatomie tribe of Indians, who resided upon their reservation in the Territory (afterwards State) of Kansas, have brought this suit to recover certain claims, aggregating. $48,325, against the United States, alleged to be due them by virtue of article 10 of the treaty with said tribe of Indians, of date February 27, 1867, promulgated August 7, 1868. (15 Stat. L., 533.) Said article is as follows:
“ It is further agreed upon the presentation to the Department of the Interior of the claims of said tribe for depredations committed by others upon their stock, timber, or other prop erty, accompanied by evidence thereof, examination and report shall be made to Congress of the amount found to be equitably due, in order that such action maybe taken as shall be just in the premises.”
This treaty of 1867 was intended for, and in fact was, a full settlement between the United States and the Pottawatomie tribe. The Indians relinquished all claim for future annuities and became citizens. Lands were allotted to them in severalty and the United States contracted with reference to the claims which the said Indians had against others.
The acts referring the claims to this court followed the report of the Secretary of the Interior to Congress after their investigation.
In pursuance of the provisions of said article 10, plaintiffs presented to the Interior Department these claims on December 24,1869. By reason of the loose and defective character of the evidence submitted in their support the papers pertain- *244 tug to tbe claims were returned by tbe Interior Department for reinvestigation and examination by tbe agent, Mr. J. EL Morris, for said Indians. This agent examined tbe claims and took tbe affidavits of each claimant and other witnesses in support thereof, and transmitted them, with all evidence taken by him, to tbe Commissioner of Indian Affairs, under date of November 9,1871, attaching Ms certificate to each claim, recommending for allowance of said claims, as just, tbe sum of $48,332.80 in tbe aggregate.
On the 20th of December, 1871, tbe Interior Department, in accordance with tbe treaty of February 27,1867, reported all of said claims to Congress, accompanied with tbe evidence taken in support of same, “for such action as tbe treaty contemplated.” Congress took no final action thereon further than to have them investigated by a special committee, until March 3,1885, when it referred said claims to this court for adjudication. This original act referring tbe claims provided: “And said court shall, in determining said cause, ascertain the amounts due, and to whom due, by reason of actual damage sustained, and said cause shall be tried without further delay, as hereinbefore provided.” (23 Stat. L., 372.)
Plaintiffs do not seem to have availed themselves of the right to bring suit under the foregoing act. The authority not being given for the consideration of any but strictly legal evidence, the presumption is that plaintiffs did not make use of the first jurisdictional statute for that reason. Congress, however, in an act entitled “An act making appropriations for the current and contingent expenses of the Indian Department, and for fulfilling treaty stipulations with various Indian tribes, for the year ending June thirtieth, eighteen hundred and ninety-two, and for other purposes,” approved March 3, 1891, further enacted as follows:
“ That the last clause of the subdivision entitled ‘ Pottawatomies? in the act entitled ‘An act making appropriations for the current and contingent expenses of the Indian Department, and for fullfilling the treaty stipulations with various Indian tribes for the year ending June thirtieth, eighteen hundred and ninety-one/ of volume twenty-three, of the Statutes at Large, be amended to read as follows:
“‘That the claims of certain individual members of the Pottawatomie Nation of Indians, their heirs or legal representatives, for the depredations committed by others upon their stock, timber, or other property, reported to Congress, under the tenth article of the treaty of August 7, 1868, be, and the *245 same are hereby, referred to the Court of Claims for adjudication. And said court shall, in determining said cause, ascertain the amounts due, and to whom due, by reason of actual damage sustained.
“ ‘And all papers, reports, evidence, records, and proceedings relating in any way to said claims now on file or of record in the Department of the Interior or any other department, or on file of record in the office of the Secretary of the Senate, ■ or the office of the Clerk of the House of Representatives, shall be delivered to said court, and in considering the merits of the claims presented to the court all testimony and reports of special agents or other officers and other papers now on file or of record in the departments or Congress shall be considered .by the court, and such value awarded thereto as in its judgment is right and proper.’”
There are two general classes of claims for whiclTrecovery is sought:
(1) For property taken or destroyed by white men.
(2) For property taken or destroyed by Indians belonging to other tribes or nations than the Pottawatomie.
While the petition on behalf of plaintiffs alleges that the. depredations for which suit is brought were committed by white men, yet the proof develops that a large number of the depredations were committed by Indians belonging to other tribes. It is. earnestly and ably insisted by counsel for the Government that under article 10 of the treaty of 1867 it was only intended to provide for the payment of depredations committed by white men; that the word “others,” used in said article, referred to and is restricted to the acts of white men only. In support of this view it is argued that “claims,” as used in said article, refers to such claims only as by some previous statute Congress had authorized payment by the Government; that such claims must have had a legal existence for payment against the Government prior to the treaty of 1867; that the treaty of 1867 did not intend to create liability for any new claim or depredation other than for which liability had been previously recognized by statute, and that the only claims for which payment is contemplated or authorized under article 10 of the treaty of February 28,1867, are such as are provided for under act of June 30,1834 (4 Stat. L., 731). While this argument is pressed with much force upon the court, we do not think it sound. The treaty of February 28,1867, made with this tribe of Indians was a contract between the parties' thereto, and in all its stipulations, which are self-executing, it *246 has the force and effect of a legislative enactment. (Whitney v. Robertson, 124 U. S. R., 194.)
In ascertaining the meaning or intention of the contracting parties, the same rules must be adopted as are applicable in construing legislative enactments. The meaning of the terms used in the treaty must be drawn from the context of the treaty itself as far as possible. The term “others,” as used in article 10 of said treaty in its ordinary accepted meaning, refers to “something different from that which has been specified, additional.” In this case the only parties being treated with are the Pottawatomie tribe of Indians, and if it had been intended that the term ^others” was to be restricted to white persons, such a restriction would have been incorporated in the treaty; and there is nothing in the context of the treaty to indicate that any such restriction was to be given that term. The contracting parties only had the power or right to engraft such restrictions upon the ordinary meaning of the language used by them. The term, as used, evidently embraces all persons other than members of the Pottawatomie tribe of Indians.
If the term, as used, was ambiguous or doubtful, this interpretation placed upon it is strengthened by reference to the acts of Congress of 1830 and 1834 (4 Stat. L., p. 411-731); and also to the treaty made with these Indians in 1846 (9 Stat. L., p. 853). Likewise it is strengthened by that rule enunciated by Yattel in treaty construction which declares “the words of a party should be construed in accordance with the geheral reasons and motives of the agreement.” And again, In re Boss, 140 U. S.,453, where the court said, in referring to a treaty, “all of its provisions must be examined in the light of attendant and surrounding circumstances.” And again, under the well-established rule that, as between the United States and the Indians, treaties are to be liberally construed in favor of the Indians. ( Worcester v. Georgia, 6 Pet., 515; Kansas Indians, 5 Wall., 737; Choctaw Nation v. United States, 119 U. S. R., 1, 28.) When we consider the situation of the parties at the time of the treaty of 1867, the past history and friendly disposition of the Pottawatomie tribe, and what the G-overnment was probably willing to do in recognition of the friendliness of the tribe, we think it certain that the parties contracted with refence to depredations complained of by the plaintiffs independent of the trade and intercourse act of 1834.
The first article of the treaty of 1846 contains this stipula *247 tion: “It is solemnly agreed that tbe peace and friendship which so happily exists between the people of the United States and the Pottawatomie tribe of Indians shall continue forever, the said tribe of Indians giving assurance hereby of fidelity and friendship to the Government and people of the United States, and the United States giving at the same time promise of all proper oare and parental protection.” Under this treaty the promise of care and protection given to these Indians is general in its terms and is restricted as against no particular parties; and under this treaty these Indians were removed by the United States to their reservation in the Territory of Kansas, where the depredations complained of in this suit were committed. This reservation was beyond the protection of the civil laws of the Government, and on that reservation they were more liable to be subject to depredations, not only from white people, but from other uncivilized tribes of Indians; therefore, this promise of care and protection was extended to them by the United States. Under the act of Congress of May 18, 1830, which was an act “to provide for the exchange of lands with any of the Indians residing in any of the States or Territories after-their removal to the west of the Mississippi River,” it was provided “that it shall and may be lawful for the President to cause such tribe or nation to be protected at their newr residence against all interruptions or disturbances from aiiy other tribe or nation of Indians, or from any other person or persons whatever,” thereby expressly obligating the Government, through the President, to extend to such Indians protection against interruptions or disturbances from any and all persons or tribes of Indians.
This act and the subsequent treaty of 1846 clearly indicates the policy of the United States toward these Indians — the protection of the strong arm of the Government being promised them as against all persons or tribes of Indians. This being the undertaking on the part of the Government by its treaty with these Indians in 1846, and the general policy of the Government toward other Indians who might be removed beyond the Mississippi River, and thereby become subject to depredations of other hostile Indians or lawless white men, as indicated by the act of 1830, when the treaty of 1867 was made with this tribe of Indians, if the Government intended to withdraw or restrict the protection previously promised to these Indians, it would have indicated such purpose by incorporating into the *248 terms of the treaty such restrictions, or withdrawal of protection. This view of the intention of the Government under article 10 of the treaty of 1867 is further confirmed by reference to the act of June 30, 1834, above referred to, which was “An act to regulate trade and intercourse with the Indian tribes and preserve peace on the frontiers.” Under that act Congress expressly limits the liability of the Government to depredations against Indians committed by white persons, and further restricts its liability for eventual indemnification to cases in which the subject of the depredation committed could not be" recovered from parties committing the same. (United States v. Perryman, 100 U. S. R.., 235.)
There Congress clearly expresses its intention that the Government shall only be liable under said act to the particular cases therein pointed out. Therefore, when the treaty with these Indians of February 28, 1867, was made, if the restrictions as to the particular classes of claims for which the Government was to be liable, contained in the act of June '30,1834, were to determine the character of claims that were authorized to be presented for payment under article 10 of said treaty, sneh restrictions should have been engrafted into the treaty; otherwise it must be presumed that the intention of the contracting parties was not to place such restrictions upon claims authorized to be presented under that treaty. For the treaty having the force and effect of a legislative enactment, the courts can not interpolate therein provisions of other acts of Congress. If only such claims as could arise under act of 1834 were included under article 10 of the treaty of 1867, as contended by counsel for the Government, then there would be no reason for incorporating article 10 in said treaty, but such claims could be as effectually prosecuted under the act of 1834. It is evidently the intention of article 10 of said treaty that all equitable and just claims for depredations committed by white persons or Indians belonging to tribes different from the Pottawatomie Nation, upon “their stock, timber, or other property,” prior to the date of said treaty, should be proper claims to be presented to the Department of the Interior and Congress for- its action thereon, and under such treaty Congress was to finally take such action on said claims as should be just in the premises. Claims which have accrued since the date of said treaty are not included therein.
While the right to render judgment on such of the claims *249 as are shown to be just is rested by the claimants on treaties alone, we think there is a clear indication of liability on the part of the United States from the phraseology of the acts referring the claims for adjudication. These mean that judgment must be rendered if the claims are found by the proof to be equitably due. To say there is no legal right of recovery would be to contradict the terms of the statute.
Those certain claims sued for in this case, which originated from the destruction or injury caused by fire to the property of said plaintiffs through carelessness or design on part of white men, it is earnestly contended, are not included in the class of claims provided for under the treaty of 1867-, because they are not the result of crime, offense, or misdemeanor, as is provided in the act of 1834. This objection is not well taken, because, as before stated, we do not think the character of the claims referred to under article 10 of treaty of 1867 are to be determined by the act of 1834. That act can not, by the court, be written into the treaty of 1867, and can form no bar to the recovery of claims provided for therein.
Item 4 of claim 22, E. It. Kennedy, for a colt killed by the Union Pacific Railway in 1867, is rejected, because to entitle the party to recovery on said claim it is necessary to show that the Union Pacific Railway killed this colt through such carelessness on its part as would have rendered it liable for same. If said railway company was not guilty of such negligence as to render it liable for the injury or accident, then no depredation on its part within the purview of said treaty has been committed, nor would there be any civil liability on the part of the railway company to respond for such injury in a suit brought against it to recover for said loss. The railway company was not a trespasser upon its right of way through said reservation. The proof in support of this claim simply states that the colt was killed through the carelessness of the employees of said railway company. This statement is simply a conclusion, and is not sufficient to justify the further conclusion that the railway company was responsible for the accident or injury, consequently the proof is insufficient to justify a recovery against the United States for this item.
There are two other claims, one, item No. 2 of claim 39 (Nah nun muk shuk) and item 7 of claim 89 (Eli Gr. Nadeau), which were instances of cheating or swindling through false representations. The first was where someone sold claimant a *250 Government liorse with a Government brand on it, and subsequently demand was made for this horse and claimant had to surrender it. The other is where a white man claimed to be an employee of the Government and bought forage, claiming it was for the Government, and gave therefor a voucher, telling him to present same for payment and it would be honored. The voucher was presented to the disbursing officer of the Government, and claimant was told it was worthless and the man who gave it not in the employ of the Government service, and payment, of course, refused.
These items grow out of contracts entered into voluntarily by claimants, and while they were defrauded thereby they are not within the purview of article 10 of the treaty of 186T, and they can in no proper sense be considered depredations committed upon “their stock, timber, or other property,” as contemplated’ under said article. These claims result from a voluntary surrender of property under contract on part of claimants. It is not to be presumed that the Government undertook to protect and indemnify these Indians against bad contracts that they may have made or against contracts by which, through the want of proper care on their part, designing parties were enabled to swindle and defraud them. To warrant such a construction, such intention on the part of the Government must be expressed in the terms of the treaty or clearly inferred from its context. Therefore, said items are disallowed. Those parts of items No. 2 and No. 3 of claim No. 37 (Salí gab), being $150 and $50, respectively, for expenses in recovering’ horses alleged to have been stolen, are also rejected, because not depredations.
The act of Congress of March 3, 1891, in referring these claims to this court for adjudication, provides “that all papers, reports, evidence, records, and proceedings relating in any way to said claims now on file or of record in the Department of the Interior or other department, or on file or of record in the office of the Secretary of Senate, or the office of the Clerk of House of Representatives, shall be delivered to said court, and in considering the merits of the claims presented to the court all testimony and reports of special agents or other officers and other papers now on file or of record in departments or Congress shall be considered by the court and such value awarded thereto as in its judgment is right and proper.” The claims which have been allowed as sustained by proof and *251 those which, have been disallowed for want of sufficient proof are shown in the findings, the reason for the. disallowances being specified. The claims, in the aggregate, which have been allowed amount to $29,329.10.
It is therefore ordered, adjudged, and decreed that the claimants respectively, their heirs or legal representatives, have and recover of the United States the said sums of money specified in the third finding of fact, and that the Secretary of the Inte-iror pay to said claimants respectively, out of any moneys which may hereafter be appropriated by Congress for that . purpose, the sums set forth in said third finding of fact, less any attorneys’ fee which may by Congress be provided to be paid to claimant’s attorney of record; but in case it shall be found that any one or more of the claimants named in said third finding has died, then, and in that event, the Secretary shall ascertain and pay to the heirs or legal representatives of each of said claimants the sum that would have been paid to the claimants if living.