**BOARD OF COM'RS OF JACKSON COUNTY, KAN., v. UNITED STATES.**

**No. 1728.**

Circuit Court of Appeals, Tenth Circuit.

Dec. 10, 1938.

Rehearing Denied Jan. 23, 1939.

Geo. M. Brewster, of Topeka, Kan. (Warden L. Noe and Floyd W. Hobbs, both of Holton, Kan., and John L. Hunt, of Topeka, Kan., on the brief), for appellant.

Raymond M. Kell, Atty., Department of Justice, of Washington, D. C. (Charles E. Collett, Acting Asst. Atty. Gen., Summerfield S. Alexander, U. S. Atty., of Topeka, Kan., Oscar Provost, Atty., Department of Justice, of Washington, D. C., on the brief), for the United States.

Before PHILLIPS, BRATTON, and WILLIAMS, Circuit Judges.

WILLIAMS, Circuit Judge.

The United States of America instituted this action under direction of its Attorney General, in accordance with Sec-

930

tion 24(1) of the Judicial Code as amended, 28 U.S.C.A. § 41(1), in the District Court of the United States for the District of Kansas, in behalf of M,Ko-Quah-Wah, its restricted or incompetent Indian ward, of the Pottawatomie Indians, hereinafter referred to as allottee, against the Board of County Commissioners of Jackson County, Kansas, to recover taxes collected by said county during the years 1919–1933, inclusive, upon land which had been allotted to said Indian under the General Allotment Act of February 8, 1887, 24 Stat. 388, 25 U.S.C.A. § 331 et seq.

The trial court submitted the disputed questions of fact to the jury, a verdict being returned in favor of the government.

The judgment of the trial court on said verdict was rendered on December 17, 1937. Petition for appeal was filed and allowed March 15, 1938, jurisdiction of this court being invoked under Section 128(a) of the Judicial Code, as amended, 28 U.S. C.A. § 225(a), page 294.

By Treaty of June 5 and 17, 1846, 9 Stat. 853, the United States of America, for a consideration, granted to the Pottawatomie Tribe of Indians a tract of land within the territory now embraced within that of the state of Kansas "as their land and home forever."[1]

Under Treaty of November 15, 1861, 12 Stat. 1191, Indian Affairs, Laws and Treaties, by Kappler, Vol. II, 2d Edition,

---

[1] 9 Stat. 853–855; Indian Affairs, Laws and Treaties, by Kappler, Vol. II, 2d Edition, p. 557:

"Article II. The said tribes of Indians hereby agree to sell and cede, and do hereby sell and cede, to the United States, all the lands to which they have claim of any kind whatsoever, and especially the tracts or parcels of land ceded to them by the treaty of Chicago, and subsequent thereto, and now, in whole or in part, possessed by their people, lying and being north of the River Missouri, and embraced in the limits of the Territory of Iowa; and also all that tract of country lying and being on or near the Osage River, and west of the State of Missouri; it being understood that these cessions are not to affect the title of said Indians to any grants or reservations made to them by former treaties. * * *

"Article IV. The United States agree to grant to the said united tribes of Indians, possession and title to a tract or parcel of land containing five hundred and seventy-six thousand acres, being thirty miles square, and being the eastern part of the lands ceded to the United States by the Kansas tribe of Indians, by treaty concluded on the 14th day of January, and ratified on the fifteenth of April of the present year, lying adjoining the Shawnees on the south, and the Delawares and Shawnees on the east, on both sides of the Kansas River, and to guarantee the full and complete possession of the same to the Pottowautomie nation, parties to this treaty, as their land and home forever; for which they are to pay the United States the sum of eighty-seven thousand dollars, to be deducted from the gross sum promised to them in the 3d article of this treaty. * * *

"Article VI. The said tribes of Indians agree to remove to their new homes, on the Kansas River, within two years

from the ratification of this treaty; and further agree to set apart the sum of twenty thousand dollars to the upper bands, (being ten dollars per head,) and ten thousand dollars to the lower bands, (being five dollars per head,) to pay the actual expenses of removing; and the sum of forty thousand dollars for all the bands, as subsistence money, for the first twelve months after their arrival at their new homes; to be paid to them so soon as their arrival at their new homes is made known to the government, and convenient arrangements can be made to pay the same between the parties to this treaty; the aforesaid sums to be also deducted from the aggregate sum granted by the United States to said tribes of Indians by the 3d article of this treaty. * * *

"Article VIII. It is agreed upon by the parties to this treaty that, after the removal of the Pottowautomie Nation to the Kansas country, the annual interest of their 'improvement fund' shall be paid out promptly and fully, for their benefit, at their new homes. If, however, at any time thereafter, the President of the United States shall be of opinion that it would be advantageous to the Pottowautomie nation, and they should request the same to be done, to pay them the interest of said money in lieu of the employment of persons or purchase of machines or implements, he is hereby authorized to pay the same, or any part thereof, in money, as their annuities are paid at the time of the general payments of annuities. It is also agreed that, after the expiration of two years from the ratification of this treaty, the school fund of the Pottowautomies shall be expended entirely in their own country, unless their people, in council, should, at any time, express a desire to have any part of the same expended in a different manner."

page 824, said reservation was to be surveyed and separate tracts therefrom assigned to those members who desired to take such tracts and who relinquished their rights to the lands held in common by the tribe, and there was to be issued to each of such members a certificate establishing his or her exclusive right to the exclusive possession of the tract assigned to and set apart to him or her "for the perpetual and exclusive use and benefit of such assignees and their heirs," and "until otherwise provided by law, such tracts shall be exempt from levy, taxation, or sale, and shall be alienable in fee or leased or otherwise disposed of only to the United States, or to persons then being members of the Pottawatomie tribe and of Indian blood, with the permission of the President, and under such regulations as the Secretary of the Interior shall provide, except as may be hereinafter provided."[2]

2 "Article I. The Pottawatomie tribe of Indians believing that it will contribute to the civilization of their people to dispose of a portion of their present reservation in Kansas, consisting of five hundred and seventy-six thousand acres, which was acquired by them for the sum of $87,000, by the fourth article of the treaty between the United States and the said Pottawatomies, proclaimed by the President of the United States on the 23d day of July, 1846, and to allot lands in severalty to those of said tribe who have adopted the customs of the whites and desire to have separate tracts assigned to them, and to assign a portion of said reserve to those of the tribe who prefer to hold their lands in common: it is therefore agreed by the parties hereto that the Commissioner of Indian Affairs shall cause the whole of said reservation to be surveyed in the same manner as the public lands are surveyed, the expense whereof shall be paid out of the sales of lands hereinafter provided for, and the quantity of land hereinafter provided to be set apart to those of the tribe who desire to take their lands in severalty, and the quantity hereinafter provided to be set apart for the rest of the tribe in common; and the remainder of the land, after the special reservations hereinafter provided for shall have been made, to be sold for the benefit of said tribe.

"Article II. It shall be the duty of the agent of the United States for said tribe to take an accurate census of. all the members of the tribe, and to classify them in separate lists, showing the names, ages, and numbers of those desiring lands in severalty, and of those desiring lands in common, designating chiefs and headmen, respectively; each adult choosing for himself or herself, and each head of a family for the minor children of such family, and the agent for orphans and persons of an unsound mind. And thereupon there shall be assigned, under the direction of the Commissioner of Indian Affairs, to each chief at the signing of the treaty, one section; to each headman, one half section to each other head of a family, one quarter section; and to each other person eighty acres of land, to include, in every case, as far as practicable, to each family, their improvements and a reasonable portion of timber, to be selected according to the legal subdivision of survey. When such assignments shall have been completed, certificates shall be issued by the Commissioner of Indian Affairs for the tracts assigned in severalty, specifying the names of the individuals to whom they have been assigned, respectively, and that said tracts are set apart for the perpetual and exclusive use and benefit of such assignees and their heirs. Until otherwise provided by law, such tracts shall be exempt from levy, taxation, or sale, and shall be alienable in fee or leased or otherwise disposed of only to the United States, or to persons then being members of the Pottawatomie tribe and of Indian blood, with the permission of the President, and under such regulations as the Secretary of the Interior shall provide, except as may be hereinafter provided. And on receipt of such certificates, the person to whom they are issued shall be deemed to have relinquished all right to any portion of the lands assigned to others in severalty, or to a portion of the tribe in common, and to the proceeds of sale of the same whensoever made.

"Article III. At any time hereafter when the President of the United States shall have become satisfied that any adults, being males and heads of families, who may be allottees, under the provisions of the foregoing article, are sufficiently intelligent and prudent to control their affairs and interests, he may, at the request of such persons, cause the lands severally held by them to be conveyed to them by patent in fee simple, with power of alienation; and may, at the same time, cause to be paid to them, in cash or in the bonds of the United States, their proportion of the cash value of the credits of the tribe, principal and interest, then held in trust by the United States, and also, as the same may be received, their proportion of the pro-

By provisions of Treaty of March 29, 1866, with said tribe (14 Stat. 763; Indian Affairs, Laws and Treaties, by Kappler, Vol. II, 2d Edition, p. 916), an amendment to the prior treaties was incorporated so as to extend the provisions thereof to the more prudent and intelligent members of said tribe, not to be confined to males and heads of families of said tribe, without distinction of sex.[3]

Said allottee, a fullblood Pottawatomie Indian who did not speak English, on land on which the taxes here in controversy were collected and which having been allotted to her on May 31, 1893, and a trust patent thereto issued on August 15, 1893, pursuant to the General Allotment Act of February 8, 1887,[4] and by executive orders dated July 30, 1918, and April 16, 1928, the trust period as provided and stipulated in said patent and said Act of February 8, 1887, was extended for an additional 20 years, to-wit, until 1938,[5] such trust period later being extended indefinitely by Act of Congress, June 18, 1934, Wheeler-Howard Act, c. 576, Section 2, 48 Stat. 984, 25 U.S.C.A. § 462.

According to a finding by a competency commission appointed by the Secretary of the Interior,[6] said allottee and her husband

---

ceeds of the sale of lands under the provisions of this treaty. And on such patents being issued and such payments ordered to be made by the President, such competent persons shall cease to be members of said tribe, and shall become citizens of the United States; and thereafter the lands so patented to them shall be subject to levy, taxation, and sale, in like manner with the property of other citizens: Provided, That, before making any such application to the President, they shall appear in open court in the district court of the United States for the district of Kansas, and make the same proof and take the same oath of allegiance as is provided by law for the naturalization of aliens, and shall also make proof to the satisfaction of said court that they are sufficiently intelligent and prudent to control their affairs and interests, that they have adopted the habits of civilized life, and have been able to support, for at least five years, themselves and families." 12 Stat. 1191, 1192.

[3] "Article I. The beneficial provisions in behalf of the more prudent and intelligent members of said tribe, contained in the third article of the amended treaty above recited, shall not hereafter be confined to males and heads of families, but the same shall be and are hereby extended to all adult persons of said tribe without distinction of sex, whether such persons are or shall be heads of families or otherwise, in the same manner, to the same extent, and upon the same terms, conditions, and stipulations as are contained in said third article of said treaty with reference to 'males and heads of families.'"

[4] Section 5 of the General Allotment Act of February 8, 1887, 24 Stat. 388, 25 U.S.C.A. § 348, Kappler's Indian Affairs, Laws and Treaties, Vol. I, 33, 34, 35, provides as follows:

"Upon the approval of the allotments provided for in sections 331 to 334, inclusive, and 336 by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the State or Territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever: Provided, That the President of the United States may in any case in his discretion extend the period * * *."

[5] Act of May 8, 1906, c. 2348, 34 Stat. 182, 25 U.S.C.A. § 349, provides:

"At the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee, as provided in section 348, then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside; * * * and thereafter all restrictions as to sale, encumbrance, or taxation of said land shall be removed * * *."

[6] Act of February 26, 1927, c. 215, 44 Stat. 1247, as amended by the Act of February 21, 1931, c. 271, 46 Stat. 1205, 25 U.S.C.A. § 352a, provides:

"The Secretary of the Interior is hereby authorized, in his discretion, to cancel any patent in fee simple issued to an Indian allottee or to his heirs before the end of the period of trust described in the original or trust patent issued to such allottee, or before the expiration of any extension of such period of trust by the President, where such patent in fee simple was issued without the consent or an

were considered "very competent people." The President of the United States issued a fee-simple patent dated April 17, 1918. The application for the issuance of said fee-simple patent submitted to the Secretary of the Interior was not signed by her, the competency commission stating, "This allottee declined to sign an application," in fact, refused to sign such application—not desiring that a fee-simple patent be issued to her. Such issuance was done altogether without her permission, and upon its receipt she requested her husband to send it back to Washington, as her husband "did the business for her," handled the operation and management of her lands, the employment of farm help, the leasing of pasture lands, and the collection of all income from the farm. During his lifetime, she did not transact any business for herself, and did not have a separate or joint bank account.

After her husband's death about 1927, a banker in a bank at which her husband had carried the bank account opened the account in her name. The husband had not possessed any land at the time of his marriage to said allottee, and except for an inheritance of land, he had no substantial source of income beyond that received from the operation and management of allottee's land.

The allottee had advised her husband to pay the taxes "for fear that if we didn't we would lose the land", and after her husband's death she advised the banker for the same reason to pay the taxes.

The patent was recorded on April 7, 1930, by one of the officers of the bank, same not being done under the direction, knowledge, permission or consent of the allottee.

The land was placed on the county tax rolls for the years 1919–1934, inclusive.

The General Allotment Act and the terms of the patent issued pursuant thereto, which by extensions is still in force, created an immunity from taxation under the laws of the state, such exemption being a present vested right in the allottee which continued as binding upon the state and its subdivisions and which could not be taken away from the allottee by the mere issuance of the fee patent during the trust period without her consent. Board of County Com'rs of Caddo County v. United States, 10 Cir., 87 F.2d 55, 56, and cases there cited.

The Treaty of 1861 provided that the land should be exempt from taxation until otherwise provided by law and for the termination of the exemption upon the issuance of a patent in fee simple, such patent to be issued only upon request of the allottee. Such fee simple patent was issued not only without the request of the allottee, but also over her protest. Congress has not by law provided for the termination of the exemption. On the contrary, by the General Allotment Act, such exemption extended until the termination of the trust period, which was duly extended until 1938, and later for an indefinite period by Act of June 18, 1934.[7] Caddo County Case, supra, 87 F.2d 55, and cases therein cited, Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941, and Ward v. Love County, 253 U.S. 17, 40 S.Ct. 419, 64 L.Ed. 751.

In Ward v. Love County, supra, it is said (at page 24, 40 S.Ct. at page 422): "As the payment was not voluntary, but made under compulsion, no statutory authority was essential to enable or require the county to refund the money. It is a well-settled rule that 'money got through imposition' may be recovered back; and, as this court has said on several occasions, 'the obligation to do justice rests upon all persons, natural and artificial, and if a county obtains the money or property of others without authority, the law, independent of any statute, will compel restitution or compensation.' * * * To say that the county could collect these unlawful taxes by coercive means and not incur any obligation to pay them back is nothing short of saying that it could take or appropriate the property of these Indian allottees arbitrarily and without due process of law. Of course this would be *in*

---

application therefor by the allottee, or by his heirs: Provided, That the patentee has not mortgaged or sold any part of the land described in such patent: Provided also, That upon cancellation of such patent in fee simple the land shall have the same status as though such fee patent had never been issued."

[7] "The existing periods of trust placed upon any Indian lands and any restriction on alienation thereof are hereby extended and continued until otherwise directed by Congress. (June 18, 1934, c. 576, § 2, 48 Stat. 984.)" 25 U.S.C.A. § 462.

*contravention of the Fourteenth Amendment, which binds the county as an agency of the state."* (Italics supplied.)

 The land was immune from the assessments from taxation, the same being void.[8] The findings and judgment are supported by substantial evidence.

Section 284 (Judicial Code, Section 177, as amended), 28 U.S.C.A. page 119, provides that no interest shall be allowed on any claim up to the time of the rendition of judgment by the Court of Claims, unless upon a contract expressly stipulating for the payment of interest, except that interest may be allowed in any judgment of any court rendered against the United States for any internal revenue tax erroneously or illegally assessed or collected, or for any penalty collected without authority or any sum which was excessive or in any manner wrongfully collected, under the internal revenue laws.

Under the Fifth Amendment to the Constitution of the United States, U.S.C.A. Const. Amend. 5, which provides that private property shall not be taken for public use without just compensation, a claimant would have been entitled to just compensation, by way of recompense, for the money wrongfully taken. The claim here is founded on the protection of the Fourteenth Amendment, U.S.C.A.Const. Amend. 14. Ward v. Love County, supra. In the Phelps Case, Phelps v. United States, 274 U.S. 341, 47 S.Ct. 611, 71 L.Ed. 1083, where the property was taken before its value was ascertained or paid, it was held that judgment rendered in 1926 for the value of the use of the property in 1918 and 1919, without more, is not sufficient to constitute just compensation, and that said Section 177, supra, does not prohibit the inclusion of the additional amount for which petitioner contends in order to fully compensate the claimant, and that it was not a claim for interest within the purpose or intention of said Section 177, Acts of Congress, to be construed and

applied in harmony with and not to thwart the purpose of the Constitution, the government's obligation being to put the owners in as good position pecuniarily as if the use of their property had not been taken, they being entitled to have the full equivalent of the value of such use at the time of the taking paid contemporaneously with the taking.

In Seaboard Air Line Ry. Co. v. United States, 261 U.S. 299, 43 S.Ct. 354, 67 L.Ed. 664, it is stated that on May 23, 1919, the United States, under authority of Act of Congress approved August 10, 1917, c. 53, 40 Stat. 276, which authorized the President, from time to time, to requisition foods, feeds, fuels, and other supplies necessary to the support and maintenance of the Army or Navy, or any other public use connected with the common defense, and to requisition, or otherwise provide, storage facilities for such supplies, and to ascertain and pay a just compensation therefor, where the President requisitioned and took possession of certain land to provide storage facilities for supplies necessary to the support of the Army and other uses connected with the public defense, it was there held that in the absence of a stipulation to pay interest or a statute allowing it, none can be recovered against the United States upon unpaid accounts or claims, and that under the act under which the property was requisitioned from the railroad company for the public use on payment of just compensation, where no provision was made in respect of interest, just compensation being provided for by the Constitution, such right cannot be taken away by statute, the ascertainment being a judicial function, and that the compensation to which the owner was entitled is the full and perfect equivalent of the property taken, it resting upon equitable principles, and meaning substantially that the owner shall be put in as good position pecuniarily as he would have been if his property had not been taken. The United States claimed in effect

---

[8] Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941; Ward v. Love County, 253 U.S. 17, 40 S.Ct. 419, 64 L. Ed. 751; Board of Com'rs of Caddo County, Okl., v. United States, 10 Cir., 87 F.2d 55, 56; Board of Com'rs of Tulsa County, Okl., v. United States, 10 Cir., 94 F.2d 450; United States v. Benewah County, 9 Cir., 290 F. 628; United States v. Nez Perce County, Idaho, 9 Cir., 95 F.2d 232; United States v. Lewis County, Idaho, 9 Cir., 95 F.2d 236; Morrow v. United States, 8 Cir., 243 F. 854; United States v. Glacier County, D.C.Mont.1936, 17 F.Supp. 411; United States v. Board of County Com'rs, D.C.N.D.Okl., 13 F.Supp. 641; United States v. Dewey County, S. D., D.C.S.D. 1926, 14 F.2d 784; United States v. Board of Com'rs, D.C.W.D.Okl., 6 F. Supp. 401; United States v. Chehalis County, D.C.Wash., 217 F. 281.

that the owner was entitled to no more than the value of the land, as of date of taking, to be paid at a later time, when ascertained, the owner being deprived of the land and its use since the taking, May 23, 1919. In the opinion it is said [page 356]:

"The owner's right does not depend on contract, express or implied. A promise to pay is not necessary. None is alleged. * * * The only question here is whether payment at a subsequent date of the value of the land as of the date of taking possession is sufficient to constitute just compensation. * * *

"The case of United States v. Rogers, 255 U.S. 163, 41 S.Ct. 281, 65 L.Ed. 566, is a condemnation case, and it was held that the owner was entitled as a part of the just compensation to interest on the confirmed award of the commissioners from the time when the United States took possession. The land was situated in New Mexico, and the proceedings were had under the Conformity Act of August 1, 1888. Chapter 728, 25 Stat. 357 [40 U.S.C.A. §§ 257, 258]. Interest was allowed, not by virtue of state statute, but as constituting a part of the just compensation safeguarded by the Constitution. Speaking for the court, Mr. Justice Day said: 'Having taken the lands of the defendants in error, it was the duty of the government to make just compensation as of the time when the owners were deprived of their property.'

" * * * The owner's right to just compensation cannot be made to depend upon state statutory provisions. The Constitution safeguards the right * * *. The rule above referred to, that in the absence of agreement to pay or statute allowing it the United States will not be held liable for interest on unpaid accounts and claims, does not apply here. The requirement that 'just compensation' shall be paid is comprehensive and includes all elements and no specific command to include interest is necessary when interest or its equivalent is a part of such compensation. * * * He is entitled to such addition as will produce the full equivalent of that value paid contemporaneously with the taking. Interest at a proper rate is a good measure by which to ascertain the amount so to be added. The legal rate of interest, as established by the South Carolina statute was applied in this case. This was a 'palpably fair and reasonable method of performing the indispensable condition to the exercise of the right of eminent domain, namely, of making "just compensation" for the land as it stands, at the time of the taking.' United States v. Sargent (C.C.A. Eighth Circuit) 162 F. 81, 84, 89 C.C.A. 81.

"The addition of interest allowed by the District Court is necessary in order that the owner shall not suffer loss and shall have 'just compensation' to which he is entitled."

The Federal Judiciary Act of 1789, Section 34, c. 20, 28 U.S.C. § 725, 28 U.S.C.A. § 725, provides: "The laws of the several States, except where the *Constitution, treaties,* or *statutes* of the United States otherwise require or provide, shall be regarded as rules of decision in trials at common law, in the courts of the United States, in cases where they apply." (Italics supplied.)

In Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed 1188, 114 A.L.R. 1487, the court held [page 822]: "Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. * * * There is no federal general common law."

Appellant complains of the failure of the trial court to subject the United States to the statutory bar of the Kansas Cash Basis Law, invoking the pronouncement in Erie R. Co. v. Tompkins, supra.

■ This being a suit by the United States government in its sovereign capacity and as guardian of its Indian wards to carry out its obligations and to protect the Indian lands which by the Federal Constitution, acts of Congress, including its treaties with Indians, and by the terms of the admission of the State of Kansas into the Union,[9] is a field in which the federal power is both supreme and exclusive. Worcester v. Georgia, 6 Pet. 515, 8 L.Ed. 483.

The same contention here advanced was put forth by other counties of the State of Kansas in early cases involving

---

9 Act of Congress, Jan. 29, 1861, 12 Stat. 126; Vol. 7, Thorpe's American Charters, Constitutions and **Organic** Laws, 1492–1908, Government Printing Office, (1909).

attempts by the counties[10] to tax Indian lands held in severalty.

In The Kansas Indians, the Blue Jacket Case, 5 Wall. 737, 18 L.Ed. 667, the court said [page 755]: "If [the Indians are] under the control of Congress, from necessity, there can be no divided authority. If they have outlived many things, they have not outlived the protection afforded by the Constitution, treaties and laws of Congress. It may be that they cannot exist much longer as a distinct people in the presence of the .civilization of Kansas, 'but until they are clothed with the rights and bound to. all the duties of citizens' they enjoy the privilege of total immunity from state taxation. There can be no question of state sovereignty in the case, as Kansas accepted her admission into the family of states on condition that the Indian rights should remain unimpaired and the general government at liberty to make any regulation respecting them, their lands, property, or. other rights, which it would have been competent to make if Kansas had not been admitted into the Union."

Complaint is also made as to the trial court's refusal to instruct the jury that under the Kansas Cash Basis Law, unless the appellee had filed with the Board of County Commissioners of Jackson County on May 15, 1933, a claim for the taxes paid prior to April 30 of that year, the appellee is not entitled to recover the taxes paid prior to that date. The specific provision of the Kansas act relied upon by the appellant provides: " * * * all claims not presented as above provided (except unliquidated claims for damages) shall be barred and shall no longer constitute a valid and existing indebtedness of the municipality." G.S. Kansas 1935, 10-1104.

■ This is merely a statute of limitations. Levant Consolidated School Dist. v. Colby Comm. High School Dist., 140 Kan. 561, 38 P.2d 684. Neither a general nor specific statute of limitations is applicable in a suit of this type. Board of County Com'rs of Osage County, Oklahoma, et al. v. United States, 10 Cir., 64 F.2d 775, 776; Board of Com'rs of Caddo County, Okl., v. United States, 10 Cir., 87 F.2d 55, 57; Board of County Com'rs of Tulsa County, Okl., v. United States, 10 Cir., 94 F.2d 450, and McGannon v. Straightlege, 32 Kan. 524, 4 P. 1042.

Then further contention by appellant is that under the Kansas decisions a county is not liable for interest in the absence of a statute expressly providing for its allowance. Jackson County Com'rs v. Kaul, 77 Kan. 715, 96 P. 45, 17 L.R.A.,N.S., 552. The same is the rule in Oklahoma. Eaton v. St. Louis-S. F. Ry. Co., 1927, 122 Okl. 143, 251 P. 1032, Brown v. Board of Education, 1931, 148 Okl. 97, 298 P. 249, and Board of County Com'rs v. City of Marlow, 1931, 148 Okl. 126, 298 P. 255.

■ Recovery cannot be limited by state statute or decision when it would operate to deprive the United States and its Indian wards of the full restitution or compensation to which they are entitled under the Fifth or Fourteenth Amendments to the Constitution of the United States, U.S. C.A.Const. Amends. 5, 14. Ward v. Love County, supra, page 24, 40 S.Ct. 419, and Board of Supervisors of Mercer County v. Cowles, 74 U.S. 118, 7 Wall. 118, 19 L.Ed. 86.

■ The sovereign immunity of a state does not extend to its counties for they may be sued in the absence of express consent. Lincoln County v. Luning, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766, Board of Supervisors of Mercer County v. Cowles, supra, and Ward v. Love County, supra.

All contentions have been examined. The judgment of the lower court should be affirmed.

---

[10] Blue Jacket et al. v. Board of Com'rs of County of Johnson, Kansas, 72 U.S. 737, 5 Wall. 737, 18 L.Ed. 667; Yellow Beaver et al. v. Board of Com'rs of County of Miami, 72 U.S. 757, 5 Wall. 757, 18 L.Ed. 673; Wan-zop-e-ah et al. v. Board of Com'rs of County of Miami, 72 U.S. 759, 5 Wall. 759, 18 L.Ed. 674.